**UNITED STATES of America,**
**Plaintiff-Appellee,**

**v.**

**George NASSE, Albert Tocco, Orland David, Robert David, Herman David and Joseph Iatarola, Defendants-Appellants.**

**Nos. 16460–16464.**

United States Court of Appeals,
Seventh Circuit.

July 31, 1970.

Rehearings Denied Nov. 2, 1970.

John Powers Crowley, Anna R. Lavin, George F. Callaghan, Arthur J. O'Donnell, Chicago, Ill., for defendants-appellants.

Thomas A. Foran, U. S. Atty., Robert J. Weber, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee; John Peter Lulinski, Michael B. Nash, Asst. U. S. Attys., of counsel.

Before FAIRCHILD and KERNER, Circuit Judges, and ESCHBACH, District Judge.[1]

FAIRCHILD, Circuit Judge.

This case concerns transactions in which automobiles were stolen, their identifying numbers altered, spurious state title documents created, and the automobiles sold in different states.

The indictment contains 30 counts. Count 1 charges a conspiracy among thirteen defendants and others. Each other count charges one or more defendants with interstate transportation of a particular stolen automobile. Five pairs of counts each relate to one automobile, but each of the pair charges a separate transportation of that automobile.

Ten defendants were involved in the trial now under consideration. The charges against Cobb, Wright, and Abraham had been severed, and these men were government witnesses. Four of those tried were acquitted, Geidens on motion at the close of the evidence, and Peter Nasse, McGurk, and Nash, by the jury.

The verdicts as to the remaining six, now appellants, were as follows: Herman David had been charged in the conspiracy count and in one transaction count for each of the automobiles involved except one. He was found guilty on counts 1 through 20, 24, and 28; not guilty on counts 22 and 23. Herman's sons, Robert (Bob) and Orland (Joe), had been charged in the conspiracy count and transaction counts 2 through 16. They were found guilty on count 1 and counts 8 through 16, but not guilty on counts 2 through 7. Joseph Iatarola had been charged in the conspiracy count and five transaction counts. He was found guilty on count 1 and counts 25, 26, 27, and 30, and not guilty on count 29. Albert Tocco had been charged in the conspiracy count and count 21. He was found guilty on both. George Nasse had been charged only in

the conspiracy count, and was found guilty.

Count 1 charged a conspiracy knowingly to transport stolen motor vehicles in interstate commerce, to receive, conceal, store, barter, sell and dispose of such stolen motor vehicles, and knowingly to transport counterfeit securities (the spurious state titles) in interstate commerce. The conspiracy was said to include stealing motor vehicles, stealing serial plates from other motor vehicles and attaching them to the stolen vehicles, altering the identification numbers on the frames of the stolen ones so as to agree, preparing counterfeit state titles for use in selling and retitling the vehicles, and transporting the stolen vehicles to other states for sale. The conspiracy was alleged to have existed from April, 1962 to November, 1965, when the indictment was returned.

The evidence fully established the pattern described, and Herman David as the central figure, supervising the transactions and creating the spurious titles.

Counts 2 through 7 relate to automobiles stolen in Illinois from April 14, 1962 to September 11, 1962. These cars have been referred to as the Nasse cars, since in each case George Nasse, of Youngstown, Ohio, obtained an Ohio title before selling the car. Counts 8 through 12 relate to automobiles stolen in Illinois from September 16, 1962 to December 20, 1962. These cars were sold in California, and have been referred to as the Scarcelli cars, from the name of the dealer who took them to that state.

Counts 13 through 16 relate to automobiles stolen in Illinois or Indiana from September 3, 1963 to November 29, 1963. These cars were sold in Missouri, Ohio, and Pennsylvania, and have been referred to as the Lasky cars (so named from a conspirator who was a witness). Count 17 relates to an automobile stolen in Illinois December 26, 1963 and sold in Indiana. It is referred to as the Wright

---

1. Judge Eschbach is sitting by designation from the Northern District of Indiana.

car. Counts 18 & 25, 19, 20 & 30, 22 & 26, 23, 24 & 27, and 28 & 29 relate to cars stolen in Illinois from February 1, 1964 to February 1, 1965 and titled in other states. They have been referred to as the Iatarola cars. Count 21 refers to a car stolen June 5, 1964 in Indiana and sold in Illinois. It is referred to as the Tocco car.

Herman David concedes the sufficiency of the evidence, but contends on appeal that much of it was derived from unlawful search. There can be no real question of the sufficiency of the evidence as to each transaction count upon which any defendant was convicted. The defendants other than Herman make various claims, including the claim that the government failed to prove the conspiracy charged and that they were prejudiced by a joint trial of the other charges, and the consideration by the jury of the statements and acts of their co-defendants as co-conspirators.

### 1. THE CLAIM OF VARIANCE AS TO THE CONSPIRACY COUNT.

Defendants allege that the evidence showed no more than a number of separate conspiracies in which Herman was one of the conspirators. They rely on Kotteakos v. United States.[2]

Here, unlike *Kotteakos*, the defendants knew that illegal acts on the part of a chain of participants—thieves, counterfeiters, camouflagers, people to transport the stolen autos, and salesmen— were necessary to the total operation. As stated in *Blumenthal v. United States*.[3]

"The scheme was in fact the same scheme; the salesmen knew or must have known that others unknown to them were sharing in so large a project; and it hardly can be sufficient to relieve them that they did not know,

when they joined the scheme, who those people were or exactly the parts they were playing in carrying out the common design and object of all. By their separate agreements, if such they were, they became parties to the larger common plan, joined together by their knowledge of its essential features and broad scope, though not of its exact limits, and by their common single goal.

\* \* \* \* \* \*

"All by reason of their knowledge of the plan's general scope, if not its exact limits, sought a common end, to aid in disposing of the whiskey. True, each salesman aided in selling only his part. But he knew the lot to be sold was larger and thus that he was aiding in a larger plan." [4]

It is true that the participants other than Herman (and perhaps his sons) changed from time to time. Some were shown to have been added and some withdrew, but the participation of some overlapped the participation of others. We deem it reasonable to consider the operations as those of a going concern, understood by all to be so, with changes in personnel, rather than as separate transactions or groups of transactions.

As stated in United States v. Varelli: [5]

"While the parties to the agreement must know of each other's existence, they need not know each other's identity nor need there be direct contact. The agreement may continue for a long period of time and include the performance of many transactions. New parties may join the agreement at any time while others may terminate their relationship. The parties are not always identical, but this does not mean that there are separate con-

2. (1946), 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557.

3. (1947), 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154.

4. Id. at 558–559, 68 S.Ct. at 257. See also 332 U.S. at 554 n. 14, 68 S.Ct. 248, and

United States v. Borelli (2d Cir., 1964), 336 F.2d 376, 383 n. 2, cert. den., Cinquegrano v. United States, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965).

5. (7th Cir., 1969), 407 F.2d 735, 742.

spiracies. See Developments in the Law—Criminal Conspiracy, 72 Harv. L.Rev. 920, 922–35 (1959).[6]

## II. THE CLAIMS OF GEORGE NASSE.

(1) Nasse was not charged in any transaction count, and claims that the evidence was insufficient to show that he was a member of the conspiracy. It is the government theory that his conduct shows he had an agreement with other participants to receive and dispose of the stolen cars.

Nasse is a used car dealer in Youngstown, Ohio. In 1962 he sold a number of used cars at an auction in Pennsylvania. Six of them were the stolen cars involved in counts 2 through 7 and another was a stolen car not involved in any transaction count. Nasse obtained Ohio titles for each before selling it. In each instance he presented a spurious Illinois or Indiana title which named as owner some automobile dealer who in fact never owned a car of that description. The three Illinois titles were purportedly notarized by the same notary, but the signatures were not genuine and the real notary's notary public stamp had disappeared before these titles were notarized. Three of the four Indiana titles were purportedly notarized by the same notary and the fourth by a different one, but neither notary had ever been commissioned in Indiana.

The cars were a Thunderbird, stolen April 14 and titled by Nasse April 16; a Cadillac stolen May 4 and titled May 15; a Cadillac stolen May 16 or 17 and titled May 23; a Cadillac stolen August 8 and titled August 15; a Cadillac stolen September 7 and titled September 14; a Cadillac stolen September 11 and titled September 18; and a Cadillac stolen September 6 and titled September 18. Illinois titles were presented for the cars stolen April 14, May 4, and May 17; Indiana titles for those stolen August 8, September 7, September 11, and September 6. When ultimately recovered, each car bore a serial plate which had been removed from some other car, as did all the cars involved in the other transaction counts.

There was opinion testimony that the Indiana titles used by Nasse came from the same source as the Indiana titles used in re-titling the cars involved in counts 18 & 25, 19, 20 & 30, 24 & 27, and 28 & 29 (Iatarola) and in count 21 (Tocco). There was opinion testimony that false numbers on the cars stolen May 4 and 17 were made with the same stamp as those on cars involved in counts 8, 9, 10, 11, and 12 (Scarcelli). There was sufficient evidence linking the false titles with Herman.

■ Thus there was ample evidence that these seven cars received, titled, and sold by Nasse had in fact passed through the hands of Herman David and other conspirators. We think also that the circumstances, particularly including the short period of time in each case between the theft and the handling by Nasse, and the repetition of the pattern seven times in five months, demonstrates a sufficient probability that Nasse was a knowing and willing participant in the scheme so that in the absence of a satisfactory explanation an inference may properly be drawn accordingly.

Nasse did not testify. He was arrested in September, 1962, by Ohio officers because of his possession of a stolen automobile and there is no proof that he was active in the conspiracy after that date. In February and March 1963 he was interviewed by FBI agent Davis about 23 cars which were found to have been stolen and which Nasse had sold at car auctions. Nasse was not in custody and voluntarily came to the office where he was interviewed. Nasse told the agent he obtained these cars from an individual he knew only as Stan; that he had met Stan casually in November, 1961 at an auction; Stan showed up in March, 1962 at Nasse's place of business with a Cadillac to sell; Nasse bought and Stan

6. See also *Blumenthal, supra,* 332 U.S. at 556–557, 68 S.Ct. 248.

came back a number of times between March and September; Stan furnished Illinois or Indiana titles; Nasse never knew Stan's last name nor how to get in touch with him; Nasse would take Stan to the bank, make out a check to cash, cash it and give Stan the proceeds; Nasse paid from $3500 to $4500 for each car and made a profit of only $50 to $150 on each car.

We think the jury was entitled to consider this narrative, as it evidently did, a fairy tale, and that Nasse's telling it strengthened rather than weakened the proof against him.

(2) The court instructed the jury, in substance, that possession of property recently stolen, if not satisfactorily explained, is ordinarily a circumstance from which the jury may reasonably draw the inference and find in the light of surrounding circumstances shown by the evidence that the person in possession knew the property had been stolen; and further instructed that it was the exclusive province of the jury to determine whether the facts and circumstances shown by the evidence warrant such inference.

■ Defendant appears to rely on cases dealing with presumptions rather than permissible inferences. We see no error in the instruction.[7]

(3) Nasse was arrested September 27, 1962, and the court instructed the jury that statements or acts of the alleged conspirators after that date should not be considered against Nasse.

Two government witnesses testified to conversations with Herman in which he said that a lot of cars had been sold to "dealers in Ohio" until these dealers were arrested with hot cars. These conversations occurred after September, 1962. Herman did not name or otherwise identify the dealers, but, since Nasse was a dealer in Ohio and had been arrested, the statements attributed to Herman were consistent with, and to some degree corroborative of, the other evidence against Nasse. Herman did not testify.

Nasse sees here an application of the *Bruton* principle that admission of a statement of one defendant, inculpating another, violates the latter's right of confrontation if the former does not take the stand, and prejudice is not avoided by a limiting instruction.[8] We note that Herman's statements were not made under circumstances where Herman was trying to shift or share the blame, a factor mentioned in *Bruton*. Their effect on Nasse's case was not "powerfully incriminating", nor "devastating." [9]

■ But assuming applicability of *Bruton* to the extent of any discernible corroborative effect, we are convinced beyond a reasonable doubt, that the jury would have reached the same verdict even if these two statements, and one other item of evidence, to be discussed, had not been before it.[9a]

■ (4) We have already mentioned the interview of Nasse by Agent Davis. In the course of it Davis asked Nasse whether he had his checks and other records of his transactions with Stan. Nasse replied they were in the custody of his attorney. Davis asked if Nasse would make them available, but Nasse declined. In final argument, apparently with this testimony in mind, but mistakenly, the prosecutor referred to Nasse's volunteering to produce his records, but failing to do so. It is not perfectly clear that Nasse's declination under these particular circumstances must enjoy the full sanctity of a claim of his constitutional right not to incriminate himself. In any event, we are convinced, as before stat-

7. See United States v. Hood (7th Cir., 1970), 422 F.2d 737, 741; United States v. Riso (7th Cir., 1968), 405 F.2d 134, 137–138.

8. Bruton v. United States (1968), 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476.

9. See *Bruton*, 391 U.S. pp. 135–136, 88 S. Ct. 1620; Slawek v. United States (8th Cir., 1969), 413 F.2d 957, 961–964, and cases cited therein.

9a. Harrington v. California (1969), 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284.

ed, that the jury would have reached the same verdict if Davis had not testified that Nasse declined to produce his records and if the prosecutor had not made his misstatement.

## III. SEARCH AND SEIZURE ISSUES.

(1) *Search of Herman David's truck on September 9, 1965.*

FBI Agent Robert L. Zimmerman obtained a warrant from the United States Commissioner to search Herman's truck. Zimmerman's affidavit described the truck and stated the address in the vicinity of which it was parked. Zimmerman stated that he had reason to believe that there were, concealed in the truck, "printing plates designed for manufacturing counterfeit checks" which had been used to commit a federal offense.

The facts relied on were stated as follows:

"That an informant has advised affiant that one Herman David has obtained from a printer in Griffith, Indiana, certain counterfeit checks drawn on a Gary, Ind. bank, all of which has been transported in interstate commerce from Chicago Heights, Ill. to Gary, Ind.; further that Herman David now has concealed in the aforesaid vehicle certain printing plates used to manufacture said counterfeit checks. That aforesaid vehicle is known to affiant as a green Ford panel truck parked at the above location.

"Affiant states that other F.B.I. agents have informed him that a truck of the description in the caption hereof is parked at the location set forth above.

"Affiant states that said informant informed the F.B.I. on a prior occasion of the whereabouts of a fugitive who was later there apprehended."

 Applying the *Aguilar* test,[10] Zimmerman's affidavit fulfills the requirement that it state "some of the underlying circumstances from which the officer concluded that the informant * * * was 'credible' * * *." It does not explicitly meet the other *Aguilar* test of stating "some of the underlying circumstances from which the informant concluded that the [items to be sought] were where he claimed they were", but we think there was sufficient detail and corroboration so as to permit the commissioner to decide that the tip was sufficiently trustworthy, as explained in *Spinelli*.[11] The informant had supplied such details as the location of the printer of counterfeit checks printed with the plates being sought, the location of the bank on which they were drawn, and the places between which the checks had been transported. Zimmerman said he had personal knowledge of the truck as well as verification from other agents of its present location. A magistrate may infer from sufficiently detailed information "that the informant had gained his information in a reliable way." [12]

The search of the truck produced a very substantial amount of evidence relevant to this case, and it was properly admitted.

(2) *Search of Herman's house on September 9, 1965.*

 In the evening of September 9, an Illinois circuit judge issued a warrant for the search of Herman's home. A state police officer made the application. His affidavit requested a warrant to search the residence and to seize counterfeit Illinois drivers' licenses and certificates of title used to commit a particular state offense. The facts supporting probable cause were stated as follows:

"Complainant has received evidence of this crime from an informant; said

10. Aguilar v. Texas (1964), 378 U.S. 108, 114, 84 S.Ct. 1509, 1514, 12 L.Ed.2d 723.

11. Spinelli v. United States (1969), 393 U.S. 410, 415–419, 89 S.Ct. 584, 21 L.Ed. 2d 637.

12. *Spinelli*, p. 417, 89 S.Ct. p. 589.

informant has previously given complainant evidence of crimes and he has proved himself to be reliable in that arrests and convictions have resulted from information given by him."

The affidavit is clearly insufficient for failure to show probable cause and the resulting search and seizure violated Herman's fourth amendment rights.

### (3) Searches incident to arrest.

The indictment in this case was issued November 12, 1965 and warrants issued for 13 defendants who would probably be found in widely separated locations.

Joe David was arrested in his home at 4:00 a. m., November 20. Agents searched his home and attached garage and discovered a radio capable of receiving FBI calls in the seat of a car in the garage. The search concluded about 5:30 a. m.

Herman was arrested in his home at 7:15 a. m. A thorough search of the home was conducted by eleven agents, looking for "license plates for cars, titles for cars, anything that would indicate an operation involving cars." The search consumed about two hours.

 Defendants assert that the searches were unreasonable because the arrest warrants were eight days old when executed. The government answers that in view of the nature of the charges, the number of defendants and the location of their residences the FBI acted reasonably in effecting the simultaneous arrests of these defendants to prevent their flight or the destruction of evidence. We find that the delay involved here was not unreasonable.[13]

Defendants also contend that the scope of the searches here violated their rights under the fourth amendment. We would agree if Chimel v. California[14] were to be given retroactive effect.

 The Supreme Court, however, has not applied Chimel retroactively[15] and several circuits, including the seventh, have held that Chimel is not to be applied to searches occurring prior to June 23, 1969, the date of the Chimel decision.[16] Thus, this case will be considered under pre-Chimel law.

Prior to Chimel, a search incident to a lawful arrest could reasonably extend to any area considered to be in the "possession" or under the "control" of the person arrested.[17] The prior law was summarized in United States ex rel. Mahoney v. LaVallee:[18]

"In Harris, supra, a thorough five-hour search of a four-room apartment was found to be incidental to a lawful arrest in the living room of an apartment, although it was apparent on the facts that, since the accused had been taken into custody, there was no danger that he would destroy the fruits or instrumentalities of the crime in the apartment or use a weapon hidden in it. And in Rabinowitz, supra, a search of a one-room office was held incidental to an arrest made there, although here too it was clear that the immediate search of the entire office without a warrant was not necessary to protect the arresting officers or to

13. See Williams v. United States (9th Cir., 1969), 418 F.2d 159.

14. (1969), 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685.

15. See Von Cleef v. New Jersey (1969), per curiam, 395 U.S. 814, 89 S.Ct. 2051, 23 L.Ed.2d 728; Shipley v. California (1969), per curiam, 395 U.S. 818, 89 S. Ct. 2053, 23 L.Ed.2d 732; and Vale v. Louisiana, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409.

16. United States v. Blassick (7th Cir., 1970), 422 F.2d 652; United States v. Bennett (2d Cir., 1969), 415 F.2d 1113; Lyon v. United States (5th Cir., 1969), 416 F.2d 91; Williams v. United States (9th Cir., 1969), 418 F.2d 159, 161; Whiteley v. Meacham (10th Cir., 1969), 416 F.2d 36.

17. See Chimel, 395 U.S. at 760, 89 S.Ct. 2034.

18. 396 F.2d 887, 888 (2d Cir., 1969), cert. den. 395 U.S. 985, 89 S.Ct. 2137, 23 L. Ed.2d 774 (1969).

prevent the destruction of the fruits of the crime. * * * And, we are reassured that the Supreme Court still adheres to its pronouncement in *Rabinowitz*, for it recently stated, it is no answer to say that the police could have obtained a search warrant, for '[t]he relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable.' United States v. Rabinowitz, 339 U.S. 56, 66, 70 S.Ct. 430, 94 L.Ed. 653; Cooper v. State of California, 386 U.S. 58, 62, 87 S.Ct. 788, 791, 17 L.Ed.2d 730 (1967). See also Ker v. State of California, 374 U.S. 23, 41–42, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963)."

We find no valid distinction between the case at hand and the *Harris* and *Rabinowitz* cases. As noted in *Chimel*,

"It would be possible, of course, to draw a line between *Rabinowitz* and *Harris* on the one hand, and this case on the other. For *Rabinowitz* involved a single room, and *Harris* a four-room apartment, while in the case before us an entire house was searched. But such a distinction would be highly artificial. The rationale that allowed the searches and seizures in *Rabinowitz* and *Harris* would allow the searches and seizures in this case." [19]

▐ Thus, we conclude that the defendants' fourth amendment rights were not violated in the searches at the time of the arrests.[20] These searches did not involve "mass seizures" of the entire contents of the houses.[21] Rather, "there was fair basis for belief that the place searched * * * would contain instruments or fruits of the crime for which the arrest was made." [22] Moreover, the facts of this case, involving an alleged conspiracy, suggest that the possibility of destruction of the incriminating evidence was not remote. The fact of the presence of two other people in Herman's home and a phone call received by him also suggest that an immediate search may have been necessary to preserve material subject to seizure

(4) *The standing of defendants other than Herman to object to the September 9 search of Herman's house.*

▐ Defendants contend that the invalidity of the search of Herman's house pursuant to an invalid warrant voids their convictions. They do not assert any possessory interest in the premises nor that their personal rights to privacy were infringed.

The Supreme Court in Alderman v. United States [23] has restated the rule:

"The established principle is that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence. Coconspirators and codefend-

19. 395 U.S. at 766, 89 S.Ct. at 2041.

20. The search in United States v. Francolino (2d Cir., 1966), 367 F.2d 1013, cert. den., 386 U.S. 960, 87 S.Ct. 1020, 18 L. Ed.2d 110 (1967) was similar to that of Joe David's car. As to the search of Herman's house, see United States ex rel. Mahoney v. LaVallee, *supra;* United States v. Durham (7th Cir., 1969), 409 F.2d 1170; United States v. Blassick, *supra;* United States v. Satterfield (7th Cir., 1969), 410 F.2d 1351; United States v. Valdes (2d Cir., 1969), 417 F.2d 335; United States v. Baratta (2d Cir., 1968), 397 F.2d 215, 223, cert. den., 393 U.S. 939, 89 S.Ct. 293, 21 L.Ed.2d 276; Lyon

v. United States, *supra;* Argo v. United States (9th Cir., 1967), 378 F.2d 301; and Abel v. United States (1960), 362 U. S. 217, 235–238, 80 S.Ct. 683, 4 L.Ed.2d 668, 684–685. Compare Shipley v. California, *supra.*

21. See Kremen v. United States (1957), 353 U.S. 346, 77 S.Ct. 828, 1 L.Ed.2d 876, and Von Cleef v. New Jersey, *supra.*

22. United States v. Francolino, *supra,* 367 F.2d at 1017.

23. (1969), 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176, reh. den., Ivanov v. United States, 394 U.S. 939, 89 S.Ct. 1177, 22 L. Ed.2d 475.

ants have been accorded no special standing." [24]

The Court's basic reasoning was as follows:

"The deterrent value of preventing the incrimination of those whose rights the police have violated have been considered sufficient to justify the suppression of probative evidence even though the case against the defendant is weakened or destroyed. We adhere to that judgment. But we are not convinced that the additional benefits of extending the exclusionary rule to other defendants would justify further encroachment upon the public interest in prosecuting those accused of crime and having them acquitted or convicted on the basis of all the evidence which exposes the truth." [25]

### (5) *The harmless error question.*

Thus, the final search and seizure question is whether the introduction of articles seized in the invalid search of Herman's home on September 9 constituted harmless error, as to him, beyond a reasonable doubt.[26]

▆ While a good deal of evidence relevant to Herman's guilt was obtained by the September 9 search of his house, the mere fact that it was relevant does not necessarily mean that defendant's substantial rights were prejudiced. To hold otherwise,

"would be tantamount to a rule of automatic reversal. Presumably evidence is admitted only if it is relevant to the defendant's guilt or innocence. Thus under [a standard finding reversible error wherever the error 'played any part in the jury's determination'] there is no piece of evidence that one can state with confidence did not 'contribute' to the conviction.

Moreover, this test is not logically related to the protection of the defendant's legitimate interests, which are unaffected by errors which were extremely unlikely to have changed the results at trial." [27]

▆ Thirty-one exhibits were recovered. Our examination of each leaves no doubt in our minds that, despite the many items obtained in this search, they were cumulative to other credible evidence or pertained to matters not in issue and that no leads prejudicial to Herman were obtained from them. Moreover, the other evidence in the case by itself left the jury no choice but to convict Herman.

### IV. CLAIMS OF BOB and JOE DAVID.

### (1) *Sufficiency of proof of conspiracy.*

Bob and Joe David were found not guilty of transaction counts 2 through 7 (Nasse cars), but guilty of transaction counts 8 through 16 (Scarcelli and Lasky cars). They claim there was insufficient evidence to support their convictions of conspiracy.

There was, however, testimony that changed serial numbers on two of the Nasse cars and on the Scarcelli cars were made by the same 3/16 inch die stamp, as well as that numbers on one of the Scarcelli cars and on the Lasky cars were made by the same 1/4 inch die stamp.

Willard Lasky testified that Bob and Joe had solicited his services in disposing of automobiles in early 1963; they had told him the automobiles were "perfect", even the secret numbers were covered and there was no way to tell that the automobile was legitimate or illegitimate; one fellow had got picked up with

---

24. *Id.* at 171–172, 89 S.Ct. at 965.

25. *Id.* at 174–175, 89 S.Ct. at 967.

26. Chapman v. California (1967), 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705; Harrington v. California (1969), 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284. See

also Note, Harmless Constitutional Error: a Reappraisal, 83 Harv.L.Rev. 814 (1970).

27. Note, Harmless Constitutional Error: a Reappraisal, 83 Harv.L.Rev. 814, 819 (1970).

one, but it was so perfect the authorities couldn't prove it was stolen; the certificates of title were so good you couldn't tell one from a real title printed in Springfield.

Scarcelli testified that Bob and Joe had solicited his services in late 1962 or early 1963 and had delivered cars and titles to him. Such deliveries must have occurred very soon after the cars had been stolen, allowing only a short time for camouflaging.

Scarcelli testified that after FBI agents questioned him, Bob David had him come to meet Bob and Joe. Joe indicated he knew about the FBI interview and said he had a radio which could pick up FBI calls. Such a receiver was later found in the car when Joe was arrested. Steger testified that after he had ridden with agents in an FBI car, Tocco told Steger "they" had heard the radio from the FBI car. Scarcelli and Lasky testified to threats made by Bob and Joe for the apparent purpose of keeping them cooperative.

█ We conclude that there is sufficient evidence that Bob and Joe were members of the conspiracy.

#### (2) *Statement by Herman.*

█ Abraham testified to a statement by Herman, already referred to, that he and Bob and Joe sold cars to a dealer in Ohio. Once the memberships of Bob and Joe in the conspiracy was established, this statement was admissible against Bob and Joe. It was sales talk to interest Abraham in cooperating and thus was in furtherance of the conspiracy. In any event, the jury seems not to have given it much weight, for it found Bob and Joe not guily of the Nasse sales.

#### (3) *Miranda problem.*

█ An agent testified that when Joe David was arrested he was given certain warnings, then shown photographs of Herman, Bob, and Lasky. He identified Herman and Bob, but denied knowing Lasky. The agent so testified after other proof showed that Joe knew Lasky. Although the defense had been given the 3500 statements of the agent no effort was immediately made to challenge the sufficiency of the warnings. The first such effort was a motion to strike, made by Herman's counsel after cross-examination of the agent was completed.

The government relies on the tardiness of the challenge.[28] We agree that the challenge was tardy and is foreclosed as a result.

### V. THE TOCCO CLAIMS.

#### (1) *Sufficiency of evidence.*

█ George Steger, who lived in Illinois, testified that in the spring of 1964 he agreed to buy a 1964 Cadillac from Tocco, proprietor of the Club Domino. Tocco delivered it May 9, together with an Indiana title, and received payment. Ervin Hager, who had met Herman in 1963 and discussed the purchase of blank Indiana titles for $1,000 each with Herman and Abraham, and subsequently stolen cars for Herman and Abraham, testified that he, Tocco, and Dauber stole a 1964 Cadillac in Blue Island, Illinois. This was the car delivered by Tocco to Steger. It does not appear to have been transported in interstate commerce after the theft and was not named in any count. The incident was, however, relevant to show intent and pattern.

A short while later, Steger negotiated with Tocco to purchase a Cadillac for Mrs. Logan, Steger's secretary. Hager

---

28. See Isaacs v. United States (8th Cir., 1962), 301 F.2d 706, 734, cert. den. 371 U.S. 818, 83 S.Ct. 32, 9 L.Ed.2d 58 (1963); Pinkney v. United States (5th Cir., 1967), 380 F.2d 882, 885–886, cert. den. 390 U.S. 908, 88 S.Ct. 831, 19 L.Ed. 2d 876 (1968); United States v. Aadal (2d Cir., 1966), 368 F.2d 962, 965; and United States v. Indiviglio (2d Cir., 1965), 352 F.2d 276.

testified that Tocco, Dauber and Hager met in Chicago Heights. Tocco said he had a sale for another car and wanted Hager to pick it up. Hager, Dauber, and another stole a Cadillac from a dealer in Elkhart, Indiana and brought it back to Tocco's Club Domino in Illinois. Hager received a title from Herman. It was shown that the payment received by Hager came from Tocco. This car was delivered June 6 to Mrs. Logan in Illinois. The Indiana title turned over to her was made out in the name of an apparently fictitious person, and came from the same source as the Indiana titles for three Nasse cars and five Iatarola cars. Tocco later procured another stolen car for a friend of Steger. Steger was interviewed by the FBI in June, 1964. Tocco asked Steger what the FBI had said and told him that "they" had heard the radio from the FBI car when Steger was in it, coming back from the police station in Harvey. Tocco said "they haven't got anything on anybody if you don't say anything."

■ Count 21 charges Tocco with the interstate transportation of the Logan car. There was proof from which the jury could find he induced Hager and Dauber to transport it. We think the proof also sufficed to show participation in the conspiracy.

(2) *3500 statements.*

Defense counsel asked for Scarcelli's grand jury testimony. The government asserted there had been no showing of particularized need. The court examined the transcript *in camera* and said he found no discrepancies.

■ Tocco asserts he was entitled to see the testimony himself. The rule on this subject stated for this circuit in United States v. Amabile [29] was limited to application in trials commencing after April 26, 1968. Without the benefit of *Amabile,* defendants were not entitled to the grand jury testimony.[30]

■ Another witness testified about matters some of which were not covered in the 3500 statements given to the defense. The prosecutor assured the court he had made a search of his files and found no additional statements. No reason was shown why this assurance should not be accepted.

■ Steger and Hager were important witnesses. They were not called before the grand jury and thus no grand jury testimony exists for possible use in impeachment. Counsel for Tocco calls our attention to second circuit decisions which have been critical of "excessive" use of hearsay in seeking indictments [31] and have at least suggested that indictments may in the future be dismissed "without a showing of prejudice to the defendant if it is clear that hearsay alone was deliberately relied upon when better evidence was readily available for presentation to the grand jury." [32] Counsel does not ask dismissal here, but asks that we hold that a government witness who has been "insulated against impeachment" by not being called before the grand jury is an incompetent witness. We are not persuaded to attempt to formulate a general rule in this area, and nothing peculiar to the case before us appears to call for such holding in this instance.

(3) *"Secret" numbers.*

Hopkins, an agent of the National Automobile Theft Bureau, testified that he examined a Cadillac and found that the numbers on the door plate, the "public" frame location, and the engine block were the same; but the "secondary" number on the frame was different. Evidently the secondary number is known

---

29. (1968), 395 F.2d 47, 53.

30. United States v. Battaglia (7th Cir., 1968), 394 F.2d 304, 315.

31. United States v. Umans (2d Cir., 1966), 368 F.2d 725.

32. United States v. Arcuri (2d Cir., 1968), 405 F.2d 691, 694, affirming 282 F.Supp. 347. See also United States v. Borelli (2d Cir., 1964), 336 F.2d 376; United States v. Catino (2d Cir., 1968), 403 F.2d 491, 496; and United States v. Beltram (2d Cir., 1968), 388 F.2d 449.

only to the manufacturer and persons concerned with identification of vehicles for insurance and enforcement purposes, such as Hopkins. Defense counsel inquired about the location and the court sustained an objection. The court denied a motion to strike Hopkins' testimony.

██ Requiring an answer would have destroyed the effectiveness of a device which is useful in the public interest, and the value of an answer was speculative. In our view, the district judge did not abuse his discretion.

(4) *Use of prior consistent statements.*

██ Tocco argues that there were two instances of use by the government of prior statements by a government witness to corroborate trial testimony or in lieu of it. It is not clear that Tocco correctly characterizes what happened. Error, if any, was insignificant.[33]

## VI. IATAROLA'S CLAIM: INSUFFICIENCY OF EVIDENCE.

Iatarola operated Rocket Service Center in Gary, Indiana, an agency for new and used automobiles, and service department. At least five automobiles involved in transaction counts passed through his hands, but he argues the evidence does not prove his guilty knowledge or his participation in the conspiracy. His testimony at trial tended to place any criminal responsibility on Philip Raschke, a government witness, who was also involved in the sales of these cars. The jury could properly believe Raschke's version.

Six Cadillacs, stolen in Illinois from February 1, 1964 to February 1, 1965 were transported to Gary, and the jury found Herman guilty of transporting each, except one stolen August 2, 1964 (count 22). Iatarola sold one of these cars to an Indiana customer and no interstate transportation resulted. Five were sold to a Missouri dealer named

Kelly, three on November 28, 1964 and two on March 26, 1965. The jury apparently thought one of the cars sold in March belonged to and was sold by Raschke and they found Iatarola not guilty as to it, guilty as to all others. Four of the cars as to which Iatarola was found guilty and the one he sold in Indiana were sold along with spurious Indiana titles from the same source as the titles of the Tocco car and three Nasse cars. All bore serial plates taken from other cars. Hager testified that he and Buonomo had stolen two of the cars and turned them over to Herman before they reached Iatarola.

In addition to the inferences as to knowledge and participation which may be drawn from the transactions just mentioned, there were additional facts from all of which we conclude the jury could properly find that Iatarola was guilty rather than an innocent associate of Raschke.

Hager testified that in September, 1965, he accompanied Herman on a visit to Iatarola. There had been some trouble about two hot cars and Herman had taken them home. Iatarola told Herman that if Iatarola didn't get his money back, he was going to put the finger on Herman and his partner. Herman promised that Iatarola would get his money when the cars were sold.

Iatarola testified that he knew Herman as a service customer and saw him about once a month. But telephone records showed two to ten calls a month from Herman to Iatarola. The telephoning increased around the time when Kelly discovered he had purchased stolen cars and made complaints.

Iatarola admitted that he had denied to an FBI agent that he had sold any cars to Kelly.

## VII. MISCELLANEOUS OTHER CLAIMS.

(1) Each defendant claims it was an abuse of discretion to deny him sever-

---

33. See, however, United States v. Lewis (7th Cir., 1969), 406 F.2d 486, 492. See also California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489, June 23, 1970.

ance and to deny mistrials on similar claims of prejudice by being tried with the others.

The principal complaint of several defendants arises from testimony of threats by one or the other of the Davids to hold other conspirators in line or to suppress testimony. We are satisfied, however, that there was no abuse of discretion and that each had a fair trial. The verdicts indicate a careful evaluation of the evidence by the jury, acquitting three defendants entirely and acquitting Herman, Bob, Joe, and Iatarola on certain counts where there may have been room for doubt.

(2) Various claims that additional instructions should have been given, that instructions should have been differently phrased, and other claims of error have been considered, but do not require detailed treatment. We find no merit.

The judgments are affirmed.