512 F.2d 458
 UNITED STATES of America, Plaintiff-Appellee,
v.
William G. GOBLE, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Terry Lee CARTER, Jr., Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Raymond F. SHAD, Defendant-Appellee,
v.
Raymond F. SHAD, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Walter K. BYRD, Defendant-Appellant.
 Nos. 73-1764-73-1767.
 United States Court of Appeals,
Sixth Circuit.
 March 5, 1975.
 
 Raymond Lape, Jr., Newport, Ky. (Court appointed), Andrew B. Dennison, Cincinnati, Ohio (Court appointed), Albert C. Hawes and Edward S. Monohan, Covington, Ky. (both Court appointed), for defendants-appellants.
 Eugene E. Siler, U. S. Atty., William Kirkland, Lexington, Ky., for plaintiff-appellee.
 Before PHILLIPS, Chief Judge, and EDWARDS, Circuit Judge, and O'SULLIVAN, Senior Circuit Judge.
 O'SULLIVAN, Senior Circuit Judge.
 
 
 1
 We consider the appeal of four defendants, William G. Goble, Walter K. Byrd, Terry Lee Carter, Jr., and Raymond F. Shad, from convictions for participation in an automobile theft operation. Jury trial was had in the United States District Court for the Eastern District of Kentucky before the Honorable Mac Swinford.
 
 
 2
 For reasons stated herein, we affirm.
 
 I. BACKGROUND
 
 3
 A 44-count indictment filed on September 21, 1971, named 24 defendants, including appellants, as having participated in a wide-ranging automobile theft operation involving 50 or more stolen cars. All defendants were charged in Count 1 with having conspired to commit various crimes against the United States, in violation of 18 U.S.C. § 371, which provides:
 
 
 4
 " § 371. Conspiracy to commit offense or to defraud United States
 
 
 5
 If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.
 
 
 6
 If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor;"
 
 
 7
 and some of them, including the appellants, were also charged with various substantive crimes in the remaining 43 counts. These counts alleged the transporting of stolen vehicles in interstate commerce, in violation of 18 U.S.C. § 2312:
 
 
 8
 " § 2312. Transportation of stolen vehicles
 
 
 9
 Whoever transports in interstate or foreign commerce a motor vehicle or aircraft, knowing the same to have been stolen, shall be fined not more than $5,000 or imprisoned not more than five years, or both;"
 
 
 10
 the receiving, concealing and disposing of such vehicles, in violation of 18 U.S.C. § 2313:
 
 
 11
 " § 2313. Sale or receipt of stolen vehicles
 
 
 12
 Whoever receives, conceals, stores, barters, sells, or disposes of any motor vehicle or aircraft, moving as, or which is part of, or which constitutes interstate or foreign commerce, knowing the same to have been stolen, shall be fined not more than $5,000 or imprisoned not more than five years, or both;"
 
 
 13
 the transporting in interstate commerce of false, forged, altered or stolen securities, in violation of 18 U.S.C. § 2314:
 
 
 14
 " § 2314. Transportation of stolen goods, securities, moneys, fraudulent State tax stamps, or articles used in counterfeiting.
 
 
 15
 Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud; or
 
 
 16
 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transports or causes to be transported, or induces any person to travel in, or to be transported in interstate commerce in the execution or concealment of a scheme or artifice to defraud that person of money or property having a value of $5,000 or more; or
 
 
 17
 Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce any falsely made, forged, altered, or counterfeited securities or tax stamps, knowing the same to have been falsely made, forged, altered, or counterfeited; or ...
 
 
 18
 Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce, any tool, implement, or thing used or fitted to be used in falsely making, forging, altering, or counterfeiting any security or tax stamps, or any part thereof-
 
 
 19
 Shall be fined not more than $10,000 or imprisoned not more than ten years or both ...;"
 
 
 20
 and the aiding and abetting of such acts, in violation of 18 U.S.C. § 2. Twenty-seven stolen cars were identified in the indictment.
 
 
 21
 While the facts of the case are important to resolution of appellants' claims, a complete recitation of the contents of the 13 volumes of trial transcript, amounting to 2,000 pages, would serve no useful purpose.[1] We do, however, set out the following background. The indictment alleged that commencing in January of 1969, and continuing until September of 1971, a large auto theft ring operated in several states, including West Virginia, Illinois, Pennsylvania, Ohio, Indiana and Kentucky. The coordinator of the operation was one William Miller, (an unindicted co-conspirator) who, together with other defendants, stole cars from car lots and other locations, including rental agencies. When stealing from car lots their usual procedure was to obtain serial numbers for door and ignition keys, and to have duplicates made for vehicles that they planned to steal. Instruments such as bolt cutters were occasionally used to break through lot barriers, and drivers of the stolen cars were furnished with identification papers, license plates and other such material when necessary. Vehicles stolen from rental agencies were procured by using false identification papers.
 
 
 22
 After the cars were stolen, they were received by other defendants who either altered the vehicle identification numbers or sold them to still other defendants who performed the alterations. Such alterations were accomplished primarily by two methods: (1) the first involved removal of the stolen vehicle's identification plate and replacement with an identification plate taken from a wrecked vehicle of similar model and year; and (b) the second method involved use of stolen blank registration and title forms on which the vehicle's true identification number and description were entered, after which the falsified documents were used to obtain title and license plates.
 
 
 23
 Ultimately, the cars which were the subjects of this vast elaborate enterprise were either disposed of by sale to innocent purchasers or were retained for use by the defendants personally.
 
 
 24
 Of the 24 defendants named in the indictment, only eight were fully tried; the remaining defendants apparently entered guilty pleas prior to or during the trial. Of the eight tried, two were found not guilty on all counts; six were convicted of substantive offenses; and five were found guilty on the conspiracy count. Only the above-named four appellants have sought review of their convictions. Their numerous assignments of error will be discussed below. Each appellant was represented by his own retained counsel at trial and each now appeals, in forma pauperis, by his respective trial attorney.
 
 
 25
 All four appellants raise issues related to conspiracy and severance, and these issues are treated in Sections II and III, infra ; Sections IV, V, VI, and VII deal with the various separate claims of error raised by Goble, Byrd, Carter and Shad respectively.
 
 II. CONSPIRACY
 
 26
 As to the conspiracy count of the indictment (Count 1) appellants rely upon what has become a popular style of charging error, and assert that while the Government may have offered evidence to prove the existence of numerous, disconnected conspiracies, it failed to show that the indicted defendants were members of a single-or general-conspiracy. It is said that because Count 1 charged appellants with membership in a single conspiracy in violation of 18 U.S.C. § 371, the District Court erred in denying their various motions for judgment of acquittal on that count.
 
 
 27
 While the testimony of the more than 70 Government witnesses described the car theft activities, most witnesses could relate only isolated acts of the defendants. Only one witness, William Miller, was able to describe the actual scope of the ring's activities and identify the respective appellants as participants. Although Miller (who was the kingpin of the operation) was named as a co-conspirator, he was not a defendant in the case; but at the time of trial, he was serving a three-year prison term on other charges arising from his conduct in the total enterprise.
 
 
 28
 While the trial was in progress, all of the appellants were seated in the courtroom, and as a preliminary question on direct examination Miller was asked: "First of all, as you look around the courtroom ... do you see anyone that you have known in the car stealing business?" His answer was: "Well, I know all of the defendants, yes" and he added that, "... the activities involving each person varied at times. We did many things together. Sometimes we stole cars, sometimes we sold cars, sometimes we retitled." He was then asked to point out any of his co-conspirators who were present, and in response he named, with others, the four appellants, William G. Goble, Walter K. Byrd, Terry Lee Carter, Jr., and Raymond Shad. He told of the use of fraudulent title papers and when he was asked which of the defendants seated in the courtroom joined in such activity, he answered: "All of the defendants." When asked: "Who else helped you transport interstate stolen cars knowing that those cars were stolen?", Miller first responded by his own question: "Of the defendants left?" Receiving the answer, "Yes," to this, he named four persons, including appellants Shad and Byrd.
 
 
 29
 In addition to his own involvement in stealing and disposing of cars, Miller acted as coordinator for those defendants who stole cars and for those who sold them. He described his role as follows:
 
 
 30
 "Q Did you say that you hired people to get cars?
 
 
 31
 A Yes.
 
 
 32
 Q When you hired them to go get a car, what did you furnish to them?
 
 
 33
 A The key normally, bolt cutters, anything else they might need.
 
 
 34
 Q What about license plates?
 
 
 35
 A License plates, title receipts, so forth and so on.
 
 
 36
 Q What about identification?
 
 
 37
 A Driver's license, normally accompanied with a credit card of some type.
 
 
 38
 Q Where did you get the credit cards?
 
 
 39
 A I purchased them or was given them by various people.
 
 
 40
 Q How many people did you have working for you to pick up the stolen cars?
 
 
 41
 A Well, when you say 'working for me', actually what would happen is if I needed a car and I knew different people were available to go get a car, or if I needed someone to help sell a car, I just contacted at random, just different people who I had been involved with or associated with previously. And many times, I-they would introduce me to other people and consequently I think this is why there was actually so many people involved with this thing all ended up."
 
 
 42
 After automobiles were stolen in this manner, Miller paid three or four hundred dollars for them and then sold them, either personally or through other participants in the theft ring. For example, approximately 12 stolen cars were sold by Miller, in conjunction with Ernest Byrd and appellant Shad, to Latonia Springs Auto Parts, a salvage yard in Covington, Kentucky. The owner of that business, Ronald Heines, testified that he and one Russell McIntire purchased the cars for an average price of $1,300 which included blank Kentucky registration papers. Both McIntire and Heines were aware that the cars they purchased from Shad and Ernest Byrd were stolen.
 
 
 43
 Miller also described the means whereby stolen vehicles were fraudulently titled. He testified that appellant Goble had showed him how to remove a vehicle identification plate from a stolen car and replace it with a plate from a wrecked car of the same model. This practice was also carried on by Ernest Byrd and appellant Walter K. Byrd. Miller also stated that he and appellant Goble occupied the same apartment and during that time they both purchased blank titles which were used in the sale of stolen cars.
 
 
 44
 The remaining testimony of Miller described how the cars identified in the various counts of the indictment were stolen. He recalled some of the participants in each theft, where each vehicle was stolen, and in most cases the ultimate purchaser of the car.
 
 
 45
 In reviewing appellants' convictions under the conspiracy count, our task is to determine whether the above facts and others in the record in total are sufficient to show that there was a general agreement and an objective among the various defendants to steal, transport and re-sell cars, as charged in the indictment, or whether there were merely numerous, separate agreements constituting multiple conspiracies.
 
 
 46
 The evidence presented at trial shows clearly that not all four appellants participated in each of the car thefts. It is well settled, however, that, "(c)onspiracy law does not require a direct connection with all coconspirators in the sense of person-to-person communication, or even specific knowledge of their identities." United States v. Greer, 467 F.2d 1064, 1070 (7th Cir. 1972), cert. denied, 410 U.S. 929, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973). See also United States v. Jones, 425 F.2d 1048, 1051 (9th Cir. 1970), cert. denied, 400 U.S. 823, 91 S.Ct. 44, 27 L.Ed.2d 51 (1970); United States v. Andolschek, 142 F.2d 503, 507 (2d Cir. 1944).
 
 
 47
 Even though in this case the overt acts charged in the indictment occurred over a period of years and involved various combinations of defendants, it was still possible for the jury reasonably to conclude that one conspiracy existed. Moreover, roof establishing the conspiracy was not limited to that supplied by its chief architect, Miller; rather, many relevant pieces and fragments were supplied by other Government witnesses.
 
 
 48
 In United States v. Nasse, 432 F.2d 1293 (7th Cir. 1970), cert. denied, 401 U.S. 938, 91 S.Ct. 927, 28 L.Ed.2d 217 (1971), 402 U.S. 983, 91 S.Ct. 1657, 29 L.Ed.2d 148 (1971), the Seventh Circuit was faced with an automobile theft operation similar to the one here. The indictment in Nasse contained 30 counts, one of which charged 13 defendants with a conspiracy in stealing motor vehicles, stealing vehicle identification plates from other vehicles and attaching them to the stolen vehicles, preparing counterfeit state titles and transporting the stolen vehicles. One central figure was found to have supervised the theft operations which involved cars stolen in Illinois and Indiana and subsequent sales in Ohio, California, Missouri, Pennsylvania, Indiana and Illinois.
 
 
 49
 In affirming the defendants' convictions on the conspiracy count, the Court stated:
 
 
 50
 "Here ... the defendants knew that illegal acts on the part of a chain of participants-thieves, counterfeiters, camouflagers, people to transport the stolen autos, and salesmen-were necessary to the total operation.
 
 
 51
 "It is true that the participants other than Herman (the central figure) (and perhaps his sons) changed from time to time. Some were shown to have been added and some withdrew, but the participation of some overlapped the participation of others. We deem it reasonable to consider the operations as those of a going concern, understood by all to be so, with changes in personnel, rather than as separate transactions or groups of transactions." 432 F.2d at 1297.
 
 
 52
 We are persuaded that the present case, like Nasse, presents a single conspiracy. Although William Miller was the only individual identified as being associated with nearly all of the auto thefts, there was evidence from which the jury could conclude that the other defendants were cognizant of, and agreed to assist in, an ongoing operation. A fair reading of Miller's testimony, together with that of other Government witnesses, strongly supports the conclusion that the auto theft operation was more than a series of isolated, independent acts. Similar methods of stealing the cars and altering their identification numbers, common outlets for distribution, and the acquaintance of the defendants with others involved in the operation are evident from the record. The absence, or withdrawal, of some defendants from some acts of the theft ring do not change the character of the conspiracy. See, Blumenthal v. United States, 332 U.S. 539, 558-59, 68 S.Ct. 248, 92 L.Ed. 154 (1947); United States v. Nasse, supra, 432 F.2d at 1297; United States v. Varelli, 407 F.2d 735, 742 (7th Cir. 1969); United States v. Levinson, 405 F.2d 971, 985 (6th Cir. 1968), cert. denied, 395 U.S. 906, 89 S.Ct. 1746, 23 L.Ed.2d 219 (1969), 395 U.S. 958, 89 S.Ct. 2097, 23 L.Ed.2d 744 (1969).
 
 III. SEVERANCE
 
 53
 Each appellant asserts that he should have been granted a separate trial. Having determined that there was sufficient evidence to support the charge of a single conspiracy, we believe the District Judge did not err in refusing to grant appellants' motions for severance. Rule 14, Fed.R.Crim.P., authorizes the granting of a severance, but the grant or denial of such a motion is a matter within the discretion of the District Judge. Opper v. United States, 348 U.S. 84, 95, 75 S.Ct. 158, 99 L.Ed. 101 (1954); United States v. Vaughn, 422 F.2d 812, 813 (6th Cir. 1970); United States v. Jackson, 409 F.2d 8, 9 (6th Cir. 1969); United States v. Vida, 370 F.2d 759, 765 (6th Cir. 1966), cert. denied, 387 U.S. 910, 87 S.Ct. 1695, 18 L.Ed.2d 630 (1967). Notwithstanding the length of the trial (11 days), and the number of witnesses called (79), and the fact that not all of the testimony of each witness related to each appellant, we find no abuse of discretion in denying the motions for severance.
 
 IV. WILLIAM G. GOBLE
 A. Count 6 (Variance)
 
 54
 Goble first asserts that the District Court erred in refusing to dismiss Count 6 of the indictment because of an asserted variance between pleading and proof, in that the indictment referred to transportation in interstate commerce of a stolen 1967 Cadillac Eldorado, whereas the relevant evidence showed that the vehicle in question was a 1967 Cadillac Coupe DeVille.
 
 
 55
 In ruling upon Goble's motion, the District Judge stated that the variance between the described body style and the actual body style was not a material one, and we agree.
 
 
 56
 The rule in this Circuit for determining whether there is a legally significant variance between the indictment and evidence was well stated in United States v. Mills, 366 F.2d 512 (6th Cir. 1966):
 
 
 57
 "A variance is not to be regarded as material where it is not of a character which could have misled the defendant at the trial, Berger v. United States, 295 U.S. 78, 82, 55 S.Ct. 629, 79 L.Ed. 1314; or where it involves no element of surprise prejudicial to the efforts of the defendant to prepare his defense, United States v. Ragen, 314 U.S. 513, 526, 62 S.Ct. 374, 86 L.Ed. 383, rehearing denied, 315 U.S. 826, 62 S.Ct. 620, 86 L.Ed. 1222; or where it does not affect substantial rights. Rule 52(a), F.R. of Crim.P.; cf. United States v. Haskins, 345 F.2d 111, 114 (C.A. 6). 'Whether or not a variance is prejudicial is a judgment that must be made on the facts of each case.' United States v. Russano, 257 F.2d 712, 715 (C.A. 2)." 366 F.2d at 514.
 
 
 58
 See also United States v. Crowder, 346 F.2d 1 (6th Cir. 1964), cert. denied, 382 U.S. 909, 86 S.Ct. 249, 15 L.Ed.2d 161 (1965). Defense counsel did not contend that the error in the indictment surprised or prejudiced appellant Goble, and we believe that his contention of a material variance is without merit.
 
 B. Counts 1 and 6 (Sufficiency of Evidence)
 
 59
 In Section V of the overt acts portion of Count 1 of the indictment (conspiracy), it was alleged that Goble transported a 1967 Cadillac DeVille (sic) from Covington, Kentucky, to Cincinnati, Ohio, for the purpose of obtaining false registration; and, in Count 6 of the indictment it was charged that Goble transported in interstate commerce a stolen 1967 Cadillac Eldorado, knowing the vehicle to have been stolen. The same vehicle was the subject of both allegations,[2] and in this appeal Goble asserts that there was no showing at trial that he transported the car in interstate commerce.
 
 
 60
 Testimony at trial showed that a blue 1967 Cadillac Coupe DeVille had been stolen from the Jim Tilly, Inc., used car lot in Lexington, Kentucky, on or about July 15, 1969. William Miller testified that he, Michael Collins, and appellant Raymond Shad had stolen the car and that they delivered it to appellant Goble in Covington, Kentucky for $300. Miller stated that, immediately after selling the car to Goble, he (Goble) removed the vehicle identification number plate and installed a different one.
 
 
 61
 On July 18, 1969, Goble sold this same automobile to one Gregory Ehlman, in Newport, Kentucky. Ehlman testified that he had met Goble at the Kentucky Ford dealership where Goble was employed as a salesman, and that when he agreed to purchase the automobile, it had Kentucky license plates, which Goble told him belonged on a car owned by Goble's wife. The two men then went together to a bank in Newport, Kentucky, so that Ehlman could finance the purchase of the Cadillac. Prior to entering the bank, Goble advised that Ehlman would have to pay eight-hundred dollars over the amount-three thousand dollars-which Ehlman could likely obtain from the bank (making Goble's "take" on the deal $3,800.00). Ehlman testified that Goble told him not to mention the extra sum of $800 to the banker, because he (Goble)
 
 
 62
 "was selling these cars besides working over there at the Ford dealer and he didn't want them (the dealer and the banker) to know about him selling these cars on the side and he told me that he bought a fleet of them and he was selling them, so I figured it was a pretty good deal, he bought quite a few and they were cheaper that way."
 
 
 63
 Ehlman further testified that when he and Goble went into the bank
 
 
 64
 "we sat down and Mr. Goble was right there with me ... and ... told him (the banker) the price of the car, not including the eight-hundred dollars that he told me outside not to mention when we got inside. So Mr. Knauf (the banker) was a pretty good dealer, he looked it up in his book and he financed the car and typed out the check for Mr. Goble and then we left. Then Mr. Goble-there was no tax on the car and he didn't have the title to it at the time. He said that he had to get the title and get it straightened out. Mr. Knauf (the banker) asked for the title also. So at that time we went over to Cincinnati to a Ford dealer down in the bottoms over there, I believe it was Fuller Ford, and he went in to try to get a temporary tag and came back out and he said he couldn't, 'no good' (sic) on a temporary tag there. But what the reason was I don't know. We took the car then down to my place of work in Ludlow and I talked to my boss about it." (Emphasis added)
 
 
 65
 Ehlman operated the Cadillac for a short time with license plates belonging to the car owned by Goble's wife but when he began having mechanical trouble with it, he traded it in at Riverside Ford (Goble's regular place of employment) in Newport, Kentucky. According to Ehlman, it was not until he traded the Cadillac for a different automobile that Goble supplied him with an Ohio title.
 
 
 66
 Although the number on the vehicle identification plate of the automobile purchased by Ehlman differed from the number of the car stolen from Jim Tilly, Inc., the evidence at the trial leaves no doubt that the same car was involved-i. e. the 1967 Cadillac Coupe DeVille which Goble sold was in fact the one stolen from Jim Tilly, Inc.
 
 
 67
 We are satisfied that the witness Ehlman's words "the car" referred to the stolen 1967 Cadillac Coupe DeVille which Goble sold to Ehlman, and that the words, "we went over to Cincinnati," referred to a journey from Newport, Kentucky to Cincinnati, Ohio, taken together by Goble and Ehlman, in the stolen car.
 
 
 68
 In reviewing the sufficiency of evidence with respect to appellant's interstate transportation of the vehicle, the jury's determination "must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it," Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), and that view of the evidence includes "inferences reasonably and justifiably to be drawn therefrom." Battjes v. United States, 172 F.2d 1, 5 (6th Cir. 1949). See also United States v. Rosinski, 487 F.2d 822, 823 (6th Cir. 1973); United States v. Milby, 400 F.2d 702, 705 (6th Cir. 1968); United States v. Decker, 304 F.2d 702, 705 (6th Cir. 1962); United States v. Berkley, 288 F.2d 713, 716 (6th Cir. 1961), cert. denied, 368 U.S. 822, 82 S.Ct. 41, 7 L.Ed.2d 27 (1961).
 
 
 69
 We hold that there was evidence from which the members of the jury could properly find, as they did, that the Cadillac sold by Goble to Ehlman had been stolen to the knowledge of Goble and that he joined in the interstate transportation of it.
 
 C. Counts 23 and 24
 
 70
 Goble also challenges his conviction on Count 23 (receiving and concealing a 1967 Cadillac Coupe DeVille moving in interstate commerce) and Count 24 (transporting the same vehicle in interstate commerce). Appellant contends that this automobile was not shown to have travelled interstate from Cincinnati, Ohio, to Covington, Kentucky, as alleged in the indictment.
 
 
 71
 The car in question was originally stolen from the lot of Cal Conell Cadillac Corporation, in Louisville, Kentucky, on or about July 26, 1969, at which time it had a Kentucky registration and license plate. Subsequently, the vehicle identification number plate was changed. William Miller testified that he stole this particular car, and that he gave it to appellant Goble. On October 3, 1969, Goble sold this automobile in Kentucky to Winfred Gray, a resident of Cincinnati.
 
 
 72
 The Government proceeded to show interstate involvement of the automobile through the chain of title. Government Exhibit 34 was an Ohio title issued August 12, 1969, to one John E. Moore of Cincinnati, for the 1967 Cadillac, with the changed vehicle identification number. This automobile, according to the title, had been previously registered in Kentucky. The title paper further purported to show that on August 15, 1969, the car was sold to appellant Goble for $3,500.00. On that date, Goble applied for and received a Kentucky registration at the Kenton County Clerk's Office. As proof of ownership, he presented the above-mentioned Ohio title. When appellant sold the car to Winfred Gray on October 3, 1969, he (the buyer) also was issued a Kentucky registration document.
 
 
 73
 Russell Simmons, Clerk of the Court in Clermont County, Ohio, testified that in order to acquire an Ohio title for an out-of-state car, the car must be physically inspected within the state of Ohio. According to William Miller, no Ohio title was acquired prior to the time that he gave the car to Goble. Miller further testified that appellant Goble kept the car and drove it for a few months with the changed vehicle identification number.
 
 
 74
 When the above evidence is viewed in a light most favorable to the Government, Glasser v. United States, supra, 315 U.S. at 80, 62 S.Ct. 457, it must be said that there was sufficient proof of interstate transportation of the involved car by Goble. Since appellant Goble was given the car shortly after it was stolen and he thereafter drove it himself for several months, it is a fair inference that Goble procured the Ohio title; and since acquisition of an Ohio title required the presence of the vehicle within the state of Ohio, its transportation to that state could be attributed to Goble. We find no error in the jury's finding that this 1967 Cadillac was transported in interstate commerce by appellant.
 
 D. Count 22
 
 75
 Count 22 charged Goble with receiving and concealing a 1968 Chevrolet Corvette moving in interstate commerce, in violation of 18 U.S.C. § 2313. It is appellant's claim that he did not receive and conceal the automobile, and that if he did, the car was no longer in interstate commerce when the receipt and concealment took place.
 
 
 76
 William Miller testified that the above-described automobile was stolen from Xenia, Ohio, in July or August of 1969, and was taken to Kentucky where it was retitled by Miller. Miller also stated that after he had driven the Corvette for approximately two months, Goble suggested that he sell the car to Riverside Ford, the dealership where Goble and defendant Harry Carter, Sr. were employed.
 
 
 77
 According to the then general manager of Riverside, Miller did trade in a 1968 Corvette on September 4, 1969, and both appellant Goble and defendant Harry Carter took some part in the trading. In return for the Corvette, Miller received a 1967 Ford Mustang and a check for $1,500.00, which amount was divided among Miller, Goble and Carter. Miller further testified that the Mustang which he received in the transaction just mentioned was later sold by him and that he and Goble divided the proceeds from that sale. These events took place while Miller and appellant Goble were occupants of the same apartment.
 
 
 78
 Although the above evidence does not show that appellant Goble personally received or concealed the involved automobile, it does show that his participation was sufficient to support a guilty verdict on the ground that he aided and abetted Miller in receiving and concealing it. 18 U.S.C. § 2. An instruction to this effect was given to the jury.
 
 
 79
 We are also convinced that the period during which Miller used the car did not terminate its interstate character. In Schwachter v. United States, 237 F.2d 640 (6th Cir. 1956), this Court said that "the interstate movement of a car does not necessarily cease when the car stops and transportation of it into the other state ends." 237 F.2d at 644. The Court went on to say:
 
 
 80
 "But its character of being a part of interstate commerce does not continue indefinitely after its transportation ends. After a period of time and depending upon what is done with the car, it may no longer be correct to treat it as moving in interstate commerce. Grimsley v. United States, 5 Cir., 50 F.2d 509; Davidson v. United States, 8 Cir., 61 F.2d 250, 255. The acquisition of the car and later sale of it by a person who is in no way connected with the theft and transportation may be under such circumstances as to terminate its interstate character. It is a question of fact under the surrounding circumstances in each particular case. Being a question of fact it is for the jury to determine. Parsons v. United States, 5 Cir., 188 F.2d 878; United Staes v. Gollin, 3 Cir., 166 F.2d 123, certiorari denied, 333 U.S. 875, 68 S.Ct. 905, 92 L.Ed. 1151; Seefeldt v. United States, 10 Cir., 183 F.2d 713, 715." Id.
 
 
 81
 Viewing the above-recited evidence in light of the Schwachter standards, we believe that it was within the province of the jury to determine that the involved automobile retained its interstate character. It apparently was not uncommon for those participating in the car theft ring to use a stolen car personally for a period of time and to dispose of it at a later time. There was sufficient evidence for the jury to conclude that this practice had occurred with respect to the 1968 Corvette and such a finding would support a guilty verdict on Count 22.
 
 E. Counts 8 and 38
 
 82
 Appellant Goble was charged in Count 8 with aiding and abetting William Miller in the interstate transportation of a stolen 1969 Ford Econoline, and in Count 38 with aiding and abetting Michael Jerome Collins and Earl Francis Crump in the interstate transportation of a stolen 1970 Oldsmobile Toronado. While apparently conceding that Miller's testimony supported these charges, appellant argues that "(t)he only evidence of any nature pertaining to the aiding and abetting was presented by the witness Miller, and other witnesses having the opportunity of knowledge of the same events contradicted Miller's testimony ..., or Miller provided the only evidence ...."
 
 
 83
 It was for the jury to determine the credibility of the witnesses at trial, including William Miller. Stripped of its rhetoric, Goble's contention with respect to Count 8 and Count 38 is simply an invitation for this Court to usurp the function of the trier of fact. We decline to do so.
 
 
 84
 F. Jury Instruction re Testimony of Accomplice
 
 
 85
 In instructing the jury, the District Judge pointed out that William Miller, together with various other witnesses who testified, were accomplices. His instruction on this subject was as follows:
 
 
 86
 "Now, you have here in this case several defendants who have testified here, who have pled guilty to the charges contained in this indictment. McQuearry, I believe his name was, McIntyre, Miller, who is named as a conspirator, though not a defendant, because he was heretofore been convicted or entered a plea of guilty to matters growing out of these same incidences, according to the evidence, and possibly others who were named as conspirators who have entered pleas of guilty. Now those defendants are accomplices. In other words, they admit that they did it and they are testifying in the case as to what occurred. And so you are instructed that you should scrutinize very carefully their testimony and weigh it with some degree of suspicion as to whether or not it is true. Simply because they are admitting that they did these things and as accomplices, it is the law that their statements on the witness stand should be carefully scrutinized; not that you shouldn't carefully consider all evidence, but because they are conspirators their testimony should be weighed."
 
 
 87
 Goble does not challenge the correctness of the instruction on the weight to be given to the testimony of an accomplice. Instead, he asserts that the District Judge confused the jury with a later observation about Miller, in particular:
 
 
 88
 "The United States says that Miller was corroborative of what had already been proven, that these other facts have already been proven and that Miller filled in the gap, so to speak, that they would have had a case even without Miller, ...."
 
 
 89
 Upon our review of the entire record in this case, we believe that this comment accurately states the Government's reason for using Miller as a witness. It does not, however, indicate that the Court agreed with the Government or that the jury's role as fact finder was being limited; and, therefore, it was not error.
 
 
 90
 We also note that at the time the specific instruction about Miller was given, the District Judge stated that Miller was "naturally under attack; by his own admission he is a thief and a robber and one who was not subject to bear a good reputation, ..." The jury was then told to "... judge Miller's testimony as to whether you believe he was telling the truth here on the witness stand ... whether what he told you from the witness stand was or was not true, and that is true of all witnesses, both witnesses for the United States and the defendants."
 
 
 91
 We find nothing improper in the above instructions.
 
 G. Right to Remain Silent
 
 92
 At the request of one or more of the defendants, but over appellant Goble's objection, the District Judge instructed the jury that the defendants could not be required to testify, and that the jury was to give no consideration to the fact that a defendant did not testify. The procedure employed by the District Judge was proper. See United States v. Epperson, 485 F.2d 514, 516 (9th Cir. 1973); United States v. Schroeder, 433 F.2d 846, 851 (8th Cir. 1970), cert. denied, 400 U.S. 1024, 91 S.Ct. 590, 27 L.Ed.2d 636 (1971), 401 U.S. 943, 91 S.Ct. 951, 28 L.Ed.2d 224 (1971); United States v. Russo, 413 F.2d 432, 434 (2d Cir. 1969); United States v. Kelly, 349 F.2d 720, 768-69 (2d Cir. 1965), cert. denied, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966).V. WALTER K. BYRD
 
 A Count 28
 
 93
 Appellant Byrd's motion for a direction of acquittal of the offense charged in Count 28-interstate transportation of a 1970 Mercury station wagon from Boone County, Kentucky, to Cincinnati, Ohio-was denied. He now challenges the sufficiency of the Government's evidence.
 
 
 94
 The automobile in question was rented from the Hertz Rent-A-Car desk at the Greater Cincinnati Airport in Boone County, Kentucky, on June 3, 1970. An attendant at the Hertz place of business-one Sue Young-testified that a man who identified himself as William Banchy rented a 1970 Mercury station wagon, and that this same car was subsequently reported as stolen and was ultimately recovered on October 14, 1970. At trial, the witness Young testified that the man who had posed as William Banchy was defendant Gary Shirk. Shirk had admitted his participation in acquiring the car when interviewed by an FBI agent.
 
 
 95
 Some time in August, a 1970 Mercury station wagon was brought to Bob's Motors used car lot in Cincinnati, Ohio, and was sold to the lot owner, Robert Lee Chambers. Chambers testified that the involved automobile was brought to his car lot by William Miller and appellant Walter Byrd; and a witness, who was present at the lot when negotiations for sale and purchase were carried on, testified that representations were made by both Byrd and Miller that Byrd owned the car.
 
 
 96
 William Miller testified that he and appellant Byrd sold the 1970 Mercury station wagon to Robert Lee Chambers in Cincinnati, Ohio, and that this car had originally been rented by Gary Shirk from Hertz. We note the following from Miller's testimony:
 
 
 97
 "A. We sold the car, the Mercury station wagon to a Mr. Bob Chambers at Eighth and State Streets in Cincinnati, who was a used car lot (sic) and who I was introduced to by Harry Carter, Sr."
 
 
 98
 Q. Now, what were the arrangements on this particular station wagon that was sold over there?
 
 
 99
 A. Well, we sold the station wagon, Kenneth Byrd, Gary Shirk-I have to say that-disregard Gary Shirk because simply at that time he was later on arrested using one of these credit cards.
 
 
 100
 A. Well he (Shirk) was not present, he was in jail. Kenneth Byrd, myself-
 
 
 101
 Q. When you say Kenneth Byrd, what is the full name?
 
 
 102
 A. Walter Kenneth Byrd. We sold the car to Bob Chambers."
 
 
 103
 Viewing the evidence in the light most favorable to the Government, together with all reasonable inferences, Glasser v. United States, supra, 315 U.S. at 80, 62 S.Ct. 457, and related cases previously set out herein, we hold that there was sufficient evidence identifying the automobile rented by Shirk as being the same one sold to Robert Lee Chambers by Walter K. Byrd. When read together, the testimony of William Miller, Sue Young and Robert Lee Chambers adequately identifies the automobile listed in Count 28 as being the one stolen by defendant Shirk.
 
 
 104
 Appellant Byrd argues that there was no evidence that he had transported the vehicle in interstate commerce, but in United States v. Johnson, 412 F.2d 787 (6th Cir. 1969), cert. denied, 396 U.S. 993, 90 S.Ct. 489, 24 L.Ed.2d 456 (1969), an automobile theft case, this Court said:
 
 
 105
 "Although the only evidence of appellant's guilt is circumstantial, appellee contends, and appellant concedes, that recent unexplained possession by a defendant of a stolen motor vehicle in another state permits an inference that he stole it and suffices to support a conviction that he transported it interstate commerce. See, e. g., United States v. Bennett, 356 F.2d 500 (7th Cir. 1966), cert. den., 384 U.S. 975, 86 S.Ct. 1868, 16 L.Ed.2d 685 (1966); Beufve v. United States, 374 F.2d 123 (5th Cir. 1967), cert. den., 389 U.S. 881, 88 S.Ct. 122, 19 L.Ed.2d 175 (1967); United States v. Messina, 388 F.2d 393 (2d Cir. 1968), cert. den., 390 U.S. 1026, 88 S.Ct. 1413, 20 L.Ed.2d 283 (1968)." 412 F.2d at 788.
 
 
 106
 In support of his position, Byrd cites this Court's decision in United States v. LaRose, 459 F.2d 361, 364 (6th Cir. 1972), in which a conviction was reversed, inter alia, for the reason that application of the rule expressed in United States v. Johnson, supra, 412 F.2d at 788, is limited to instances in which the car was "recently stolen." In LaRose, however there was an interval of almost two years between the theft and the appellant's possession of the stolen vehicle in another state, while in the case before us the interval between the theft of the vehicle in Kentucky and its sale by appellant in Ohio was only from June 3, 1970, to a day in August of the same year. Therefore, we conclude that there was no failure of proof on Count 28 as to appellant Byrd.
 
 B. Count 32
 
 107
 In Count 32 appellant Walter K. Byrd and two others were charged with the transportation of a stolen 1970 Chevrolet Impala in interstate commerce from Newport, Kentucky to Indianapolis, Indiana, and Byrd again raises the issue of sufficiency of the evidence.
 
 
 108
 Harold Mays, the lease manager of Campbell County Motors, Newport, Kentucky, testified that a 1970 Chevrolet Impala was leased from his agency on July 14, 1970, by a man identifying himself as Kenneth W. Hicks. The car was never returned. An employee at Campbell County Motors, Anita Estridge, testified that the man posing as Hicks was in fact appellant Walter K. Byrd,.
 
 
 109
 The car thus leased from Campbell County Motors was later found abandoned near Gainesville, Georgia on September 24, 1970. Among the articles found in the automobile at that time was a note which stated:
 
 
 110
 "Terry
 
 Call me soon as you get back
 683-4836
 
 111
 Ken."
 
 
 112
 The indicated phone number was listed under the name of Sherry Byrd, wife of appellant Walter K. Byrd, who was also referred to as Kenneth Byrd.
 
 
 113
 William Miller testified that the involved vehicle had been leased by Byrd using identification papers of a man named Hicks, and that Miller and defendant Terry Boothe, had driven the car to Georgia after it had been damaged. Miller also testified that the involved car had been driven to Ohio where it was wrecked and that Walter Byrd with defendants Gary Shirk and Terry Boothe were in the car when the wreck occurred. He then went on to say that the car had previously been driven to Indianapolis, Indiana, and when asked who was in the car when it was driven to Indianapolis, Miller said: "All three of us."
 
 
 114
 The Government did not specifically clarify the above testimony regarding who was in the car in Indianapolis; but we are of the view that, in context, the words, "all three of us," could be fairly interpreted by the jury as identifying Boothe, Shirk and appellant Walter Byrd, particularly in light of the very next exchange between Government counsel and witness Miller, which exchange was obviously premised upon the presence of four persons (including Miller);
 
 
 115
 "A. How long was that '70 Chevrolet Impala in either those three persons' possession or in your possession?
 
 
 116
 "A. Well, I don't know how long they had it before they came to me ..."
 
 
 117
 C. Evidence of Misconduct Not Charged in the Indictment
 
 
 118
 Byrd's final assignment of error is based upon the admission of testimony regarding criminal conduct not charged in the indictment. Such testimony, it is said, was prejudicial as to this appellant.
 
 
 119
 Reference to the criminal conduct-an attempted burglary of a fur company in Anderson, Indiana-was first made by a member of the Anderson police department. The officer testified that on November 1, 1970, he was called to investigate a report of an attempted burglary of a fur company, that during his investigation two cars, including a 1970 Pontiac were discovered, and that William Miller and appellant Byrd were arrested.
 
 
 120
 Although the officer mentioned the fact that these arrests were a result of his being called to the burglary, the District Judge, upon objection by defense counsel, did not allow the witness to give details of the burglary.
 
 
 121
 The second reference to the burglary was by William Miller. He testified that after defendant Gary Shirk rented a 1970 Pontiac in Dayton, Ohio, Miller, Shirk and appellant Shad drove the car to Indiana. The following from his testimony is relevant:
 
 
 122
 "Q What did you do then after you couldn't license it (the rented car)?
 
 
 123
 A On that weekend we drove the car and attempted to commit a burglary in Indiana, in that particular car.
 
 
 124
 Mr. Hiltz: I move to strike that. We are not talking about a burglary here.
 
 
 125
 The Court: Overruled. He may tell the circumstances.
 
 
 126
 Q All right, when you got to Anderson, what did you do?
 
 
 127
 A We, so to speak, cased a fur store about two blocks, from their aunt's house and later on, on a Sunday night of that weekend we were arrested attempting to burglarize this fur store.
 
 
 128
 Q Who arrested you?
 
 
 129
 A The Anderson City Police Department.
 
 
 130
 Q How were you arrested? How did they happen to catch you?
 
 
 131
 A They-
 
 
 132
 The Court: Objection sustained. I don't think there's any point in going into the details of that incident."
 
 
 133
 The above testimony, like that of the policeman, was relevant to a particular act which the Government alleged was part of the conspiracy. The testimony of both witnesses dealt with the theft of a 1970 Pontiac after it had been rented by one of the defendants in Ohio, and as indicated by the District Judge, the circumstances of the arrest of appellant and Miller were relevant.
 
 
 134
 The principle governing admission of evidence of misconduct not charged in the indictment was stated by this Court in Grant v. United States, 255 F.2d 341 (6th Cir. 1958), cert. denied, 358 U.S. 828, 78 S.Ct. 48, 3 L.Ed.2d 68 (1958):
 
 
 135
 "In Harper v. United States, 99 U.S.App.D.C. 324, 239 F.2d 945, 946, the rule here applicable was stated as follows: 'The general rule is that upon the trial of an accused person the prosecution may not introduce evidence of another offense wholly independent of one charged. However, there are many well established exceptions to this rule, so numerous that it has been said that it is difficult to determine which is the more extensive, the doctrine or the acknowledged exceptions. This Court has admitted evidence of other criminal acts when those acts (1) are so blended or connected with the one on trial that proof of one incidentally involves the other, (2) they explain the circumstances of the offense charged, or (3) they tend logically to prove any element of that offense.' The evidence of the other crime of which appellant complains, is clearly within the purview of the exceptions above mentioned, and was properly admitted by the trial court." 255 F.2d at 342.
 
 
 136
 See also United States v. Clark, 437 F.2d 942, 944 (6th Cir. 1971); 1 J. Wigmore, Evidence, § 216 (3rd Ed. 1940).
 
 
 137
 Under the rule stated in Grant, we believe the District Judge was justified in permitting the witnesses to testify regarding the circumstances of the arrest. As the Government correctly argues, this event was blended with the prior acquisition of the 1970 Pontiac and subsequent attempt to conceal it by using false identification and registration papers. Walter K. Byrd was charged in the conspiracy count and the evidence of the events in Indiana was relevant to that charge.
 
 
 138
 VI. TERRY LEE CARTER, JR.
 
 
 139
 Appellant Carter asserts that there was insufficient evidence to support his conviction under Count 2-receiving and concealing a stolen motor vehicle moving in interstate commerce-in that there was no proof that the car in question had been stolen.
 
 
 140
 The involved car was a 1968 Cadillac Eldorado. William Miller testified that he, together with appellants Shad and Byrd, stole the car in Champaign, Illinois, in June or July of 1969, and thereafter sold it to appellant Carter (who had previously ordered it from Miller). The sale was for $1,000, a sum which Miller estimated as at least $3,000 below the true value of the car. Carter was aware that Miller filled orders for cars by means of thievery, and that the specific Cadillac that Miller obtained for him was stolen. On September 12, 1969, appellant Carter was arrested by the Covington, Kentucky police while driving the stolen vehicle.
 
 
 141
 The sum of Carter's contention is that the Government attempted to prove that the 1968 Cadillac had been stolen from its owner, Gene Smith Auto Sales in Champaign, Illinois, but failed to do so, because the last entry on the title documents kept by the Illinois Secretary of State showed one Robert DeLong, rather than Gene Smith Auto Sales, as the owner of record. This assertion is specious.
 
 
 142
 It is true that the Secretary of State's record showed DeLong as the last registered owner of the vehicle; but business records admitted into evidence showed that on June 6, 1969, DeLong had traded the car in to Gene Smith Auto Sales for a newer model. Moreover, the owner of the dealership testified that, in Illinois, assignments of automobile titles to dealers are not submitted to the Secretary of State for recording until the automobile is resold to an individual purchaser.
 
 
 143
 Thus, the testimony and documentary evidence clearly established that Gene Smith Auto Sales owned the 1968 Cadillac (which was the subject of Count 2 of the indictment) when it was stolen.
 
 VII. RAYMOND F. SHAD
 
 144
 Appellant Shad's principal allegation of error concerns the District Court's refusal to exclude the testimony of one Mae McComb, who, as a Government witness, revealed various facets of the auto theft ring's operation, including meetings between Shad and other defendants, her own conversations with Shad concerning the stolen cars, and certain other of Shad's activities. The objection made regarding her testimony was that at the time these events occurred, Mae McComb-who was then Mae Caldwell-was Shad's common law spouse. Upon examination of McComb, the District Judge determined that appellant had failed to prove the existence of a common law marriage. We agree.
 
 
 145
 Mrs. McComb testified that she lived with appellant in Ohio from mid-1967 to mid-1971, or approximately four years. She received credit cards from various stores during this period and signed them with Shad's name. Of the two apartments in which appellant and McComb lived, neither was leased to them as husband and wife. Mrs. McComb further testified that the landlord of their second apartment knew they were not married, and that both her name (Mae Caldwell) and Shad's were listed on the apartment mailbox. Although Shad did, on occasion, introduce Mrs. McComb as his wife, she stated that this did not occur often, and that she told no relatives that she and Shad were married. Mrs. McComb, did, however, use the name of Mae Shad at one of several clubs where she was employed "but it was not to make them believe we were man and wife ..."
 
 
 146
 Upon sufficient proof of "cohabitation and reputation of marriage of the parties," the state of Ohio recognizes the existence of a so-called common law marriage. Ohio Rev.Code Ann. § 3105.12. The criteria for recognition of such a union were set forth in Umbenhower v. Labus, 85 Ohio St. 238, 97 N.E. 832 (1912), as follows:
 
 
 147
 "An agreement of marriage in praesenti when made by parties competent to contract, accompanied and followed by cohabitation as husband and wife, they being so treated and reputed in the community and circle in which they move, establishes a valid marriage at common law ..." (Syllabus)
 
 
 148
 However, commonlaw marriages are strongly disfavored in Ohio as contravening public policy, and, as a result, each of the above-described elements must be proved by clear and convincing evidence. In re Estate of Redman, 135 Ohio St. 554, 21 N.E.2d 659 (1939); In re Estate of Soeder, 7 Ohio App.2d 271, 220 N.E.2d 547 (1966).
 
 
 149
 Although Shad and Mrs. McComb cohabited for some time, the testimony at trial shows conclusively that there was no agreement of marriage in praesenti between them, and that few people, if any, with whom they associated knew them as husband and wife. Indeed, their own actions, such as the leasing of apartments in their individual names and the maintaining of the two names on their mailbox, were inconsistent with the claimed marriage. We find no error in the District Judge's determination on the issue of common law marriage.
 
 VIII. CONCLUSION
 
 150
 In their multiple addresses to us, appellants have made numerous arguments which are not specifically treated in this opinion, either because they are essentially duplicative of presentations made by other parties to this appeal and are covered herein or because they are patently without merit. However, we have carefully reviewed each contention made, against the background of the record in this cause, and on that basis, we are convinced that there are no grounds for reversal.
 
 
 151
 Accordingly, the judgment of the District Court is affirmed.
 
 
 
 [1]
 It is appropriate to note that our task in this case would have been less onerous if either appellants or the Government had seen fit to furnish us with an appendix constructed in accordance with Fed.R.App.P. 30 and good appellate practice. In this respect, counsel for all parties to the appeal failed in their duty to this Court
 
 
 [2]
 As discussed in Section IV A, supra, the Cadillac Eldorado referred to in Count 6, in fact, proved to be a Cadillac Coupe DeVille