UNITED STATES of America,
Plaintiff-Appellee,

v.

James Blair PORTER, Jr., John Matthews
(alias Kenneth Wayne Taylor), and Gary
Dennis Brickey, Defendants-Appellants.

Nos. 81–5617, 81–5618 and 81–5648.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 8, 1982.

Decided March 10, 1983.

Rehearings and Rehearings En Banc
Denied May 3, 1983.

Edward Witt Chandler, Memphis, Tenn., Stephen M.R. Rempe, Ronald A. Spears, Phoenix, Ariz., for defendants-appellants in No. 81–5617.

W. Hickman Ewing, Jr., U.S. Atty., Timothy Discenza, Asst. U.S. Atty., Memphis, Tenn., for U.S. in all cases.

Thomas E. Hansom, Memphis, Tenn., for defendants-appellants in No. 81–5648.

Wayne Emmons, Ash Flat, Ark., for defendants-appellants in No. 81–5618.

Before MARTIN, Circuit Judge, and PHILLIPS and BROWN, Senior Circuit Judges.

PHILLIPS, Senior Circuit Judge.

James Blair Porter, Jr., John Matthews (alias Kenneth Wayne Taylor) and Gary Dennis Brickey appeal their jury convictions for conspiracy to possess with intent to distribute a controlled substance in violation of 21 U.S.C. § 846, and conspiracy to import a controlled substance into the customs territory of the United States in violation of 21 U.S.C. § 963. They raise numerous claims of trial error involving the failure to allow discovery, the failure to suppress evidence and the allowance of allegedly prejudicial comments by the prosecutor concerning the defendants' silence at the trial. Appellant Brickey also asserts certain individual arguments on appeal. We hold that these claims are without merit and affirm the convictions of all appellants.

## I

Appellants Porter and Matthews (alias Taylor) raise three main contentions on appeal, which are also adopted by appellant Brickey. First, they argue that their fifth and sixth amendment rights were violated by the refusal of the District Judge to allow their counsel and experts to board a United States Customs plane to examine radar and infrared electronics and surveillance equipment used to intercept, track and observe the aircraft which brought the controlled substance involved in this case into the United States. Second, they argue that the prosecutor at the trial violated their fifth amendment right against self-incrimination by improperly commenting on their failures to testify. Finally, they challenge the validity and execution of the warrant authorizing the search of an airplane hangar at the West Helena Airport in Forrest City, Arkansas.

In addition to these contentions, Brickey makes individual arguments. He alleges that the District Judge erred in holding that his arrest and detention were supported by probable cause, in denying his motion that the District Judge recuse himself for prejudice, in denying his motion to sever the trials and in denying his motion for a directed verdict.

## II

On January 26, 1981, at approximately 10 p.m., United States Customs officials in a Cessna Jet sighted an aircraft flying at low altitude and without lights over international waters off the coast of Florida. The sighting was made with the aid of a highly sophisticated air-to-air radar system and forward looking infrared radar (FLIR) located on the specially equipped Customs plane. The infrared equipment enabled the Customs officials to identify the suspicious aircraft as a low wing, twin engine plane.[1]

Using this surveillance equipment, the Customs plane tracked the suspect aircraft into United States air space, at which time the plane climbed to a normal altitude and turned on its navigation lights. At this point, a second group of Customs officials flying in a Beechcraft King Air Customs plane made a visual sighting of the suspect plane, and noted that its tail light was unusually bright. With the help of other Customs planes, not specially equipped, the Cessna Customs Jet followed the suspect aircraft northward over Florida and then westward over Georgia, Alabama and Mississippi. The tracking of this plane was continuous except for one brief period over Alabama when de-icing equipment on the Cessna Jet was utilized, causing the aircraft power system momentarily to cut off the surveillance equipment. When the equipment was reactivated, it locked onto the target reasonably assumed to be the suspect aircraft since the plane was continuing in the same northwesterly course at the same speed and altitude.

Near Holly Springs, Mississippi, the suspect aircraft gradually dropped off the radar screen as if it were making a landing approach. The Holly Springs police were alerted and two officers proceeded to the Holly Springs Airport, arriving sometime after 2:20 a.m. on the morning of January 27. Upon their arrival they observed a twin engine plane taking off and heading in a westward direction, after having apparently been refueled from a pickup truck at the airport. The pickup truck was observed parked in an airport area that normally is locked and closed during night hours. The police searched the inside of the truck and found bolt cutters, suitcases, fuel tanks, aircraft radio equipment, flight logs, and manila folders labeled "N75DE." In the meantime, the sheriff's department had been alerted and a deputy sheriff arrived at the airport shortly after the Holly Springs

---

1. Testimony at the pre-trial hearing and at the trial revealed that the FLIR system allows a person to see particular objects in the dark by picking up the heat emitted from those objects and transposing the image of the object through a camera-like device onto a screen, similar to that on a black and white television set. The system allows one to make a generic identification of the object. For example, the operator is able to distinguish between people and other objects, or a Cessna Citation and a DC–3, but not between two different DC–3's.

Police. He testified that a search of the area was carried out, revealing that the lock at the airport entrance had been cut.

Sometime after the suspect aircraft left the Holly Springs area, the Memphis Area Control Center notified Customs that a possible target had been picked up headed toward Helena, Arkansas. The Beechcraft King Air Customs plane, not specially equipped, was vectored to this target and followed it to the West Helena Airport. The pilot of the Customs plane was able to make a visual identification of the suspect aircraft as a twin engine Piper Navajo, with a bright tail light similar to the one he had noticed on the plane that entered U.S. air space from off the coast of Florida. The Customs plane proceeded to land at the West Helena Airport behind the suspect aircraft, and tried to block its departure. The aircraft managed to escape, however, narrowly avoiding a collision with the Customs plane. While the planes were on the ground, the Customs official was able to see the aircraft's pilot and its identification number. He identified the pilot as appellant Porter, and the plane's number as N76DE.

By the time the Navajo aircraft was airborne again, the specially equipped Cessna Customs plane had arrived and "locked on" its radar to the suspect plane. The aircraft was followed by Customs officials until it landed again at the Forrest City Airport in Arkansas. With the aid of the FLIR system, the Piper Navajo aircraft was observed to come to a stop, two persons were seen to emerge for a short time, an object was observed to be left near the runway, and the plane then immediately took off again. Shortly thereafter, a 50 pound bundle of marijuana was picked up near the runway by local police.

The suspect plane then proceeded to the Arlington Airport in Tennessee, where it landed again. The plane observed to land was the same Piper Navajo aircraft, with identification number N76DE, that the Customs officials previously had identified. This time government planes prevented another departure, and appellants Porter and Matthews (alias Taylor) were arrested while they were trying to hide in the immediate area. A search of the plane revealed a small amount of marijuana debris found in the passenger area, from which all the seats had been removed.

The deputy sheriff testified that, meanwhile, after it became light at the Holly Springs Airport on January 27, a more comprehensive search of the area around the pickup truck was carried out. A piece of torn blue cloth was found on a barbed wire fence reasonably near the truck. Down feathers were also found by this spot in the fence, and leading through a field for about a mile. The deputy further testified that later that morning, after he had left the airport, he received a report that a man wearing a blue coat was seen going down toward some railroad tracks about two or three miles from the airport. The railroad tracks were located in the same direction the down feathers were leading.

The deputy sheriff went to the described area, where he saw a man attempting to hide. He then arrested the man, who turned out to be appellant, Brickey. Brickey was wearing a blue goose down jacket that had been torn. According to the deputy, the arrest was made at 8 a.m. on January 27. It was made without a warrant. During a search of Brickey's person $600 was found, along with his papers and other identification. Furthermore, after being incarcerated, Brickey made some reference to some tape or tapes located in the camper truck as being in his truck.

On January 28, local police in West Helena obtained a search warrant for a hangar at the West Helena airport, where they discovered the missing Navajo airplane seats and more marijuana residue. A government witness testified at trial that he had leased a Piper Navajo, No. N76DE, to a "John Peters", whom he identified as appellant Porter. He also testified that he "leased" the hangar to Porter in the sense that he allowed Porter to use the hangar occasionally if needed, but that Porter was given no control over it.

Porter, Matthews (alias Taylor) and Brickey subsequently were indicted on the two counts previously mentioned. Prior to trial, several motions to suppress evidence were made by the defendants involving, among other things, the evidence obtained as a result of the search of the hangar at the West Helena Airport, and that obtained as a result of Brickey's arrest. A suppression hearing was held and all motions were overruled. The defendants made several attempts to obtain discovery of the Customs surveillance equipment, including a motion for a continuance for that purpose. These motions, along with the pretrial motions made by Brickey, also were denied and the case proceeded to trial.

### III

The major issue in this appeal is whether the constitutional rights of appellants were violated by the refusal of the District Judge to allow their counsel and experts to examine the classified surveillance equipment aboard the U.S. Customs plane. The decision of the District Judge not to allow discovery was based on his conclusion that the defendants had not met the materiality standard of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Appellants claim that this refusal denied them their fifth amendment right to a fair trial and their sixth amendment right to confront effectively the witnesses against them. They argue that the law requires the government either to allow discovery of the classified information or to dismiss the charges against them. *See United States v. Andolschek,* 142 F.2d 503 (2d Cir.1944); *Attorney General of the United States v. Irish People, Inc.,* 502 F.Supp. 63 (D.D.C.1980, rev'd 684 F.2d 928 (D.C.Cir.1982)).

Fed.R.Crim.P. 16(a)(1)(C) provides for liberal discovery by defendants in criminal cases. However, we conclude that this rule does not require reversal of the district court under the facts and circumstances of the present case. The ultimate question is whether the denial of discovery deprived defendants of a fair trial.

Section 4 of the Classified Information Procedures Act, 18 U.S.C.App. § 4 (1976 &

Supp. V 1981). 94 Stat. 2025, authorizes the district court to delete classified material from the information made available to defendants. Section 6(e)(2) of the Act further provides as follows:

(2) Whenever a defendant is prevented by an order under paragraph (1) from disclosing or causing the disclosure of classified information, the court shall dismiss the indictment or information; except that, when the court determines that the interests of justice would not be served by dismissal of the indictment or information, the court shall order such other action, in lieu of dismissing the indictment or information, as the court determines is appropriate. 18 U.S.C.App. § 6(e)(2) (1976 & Supp. V 1981).

It is to be emphasized that this statute by its terms does not require dismissal of the indictment in every case where a defendant is denied access to classified equipment or information. The district court is authorized to refuse to dismiss the indictment "when the court determines that the interests of justice would not be served by dismissal." We conclude that the district court did not abuse its discretion in failing to dismiss the indictment under the facts and circumstances of this case.

Viewing the record as a whole, we conclude that even if the defendants may have been hampered to some degree by inability to inspect the surveillance equipment in their defense against the charge of the conspiracy to import a controlled substance, they were not deprived of a fair trial. Nor did the denial of discovery taint the trial as a whole to the extent that it rose to the level of a constitutional deprivation.

First, this is not a case where defendants were disallowed all access to discovery of the classified information in question. At the pretrial hearings on defense motions, the defendants were allowed extensive cross examination of the pilot and the Customs surveillance operator who were aboard the specially equipped Customs plane. Testimony revealed that the air-to-air radar was the same system used in the F–16 Fighter produced by Westinghouse. The

infrared system was also described in detail, including testimony concerning its operation, its range, and its ability to distinguish between various objects observed. The defendants offered no expert testimony challenging the capabilities of the surveillance systems relied upon in this case.

Second, a review of the record reveals that there was substantial independent evidence verifying and corroborating the information obtained by the surveillance equipment, and supporting the verdicts of the jury. The essential characteristics of the suspect aircraft were corroborated by the eyewitness testimony of the pilot of the Beechcraft King Air Customs plane, who also correctly identified the plane's identification number and its pilot. The landing and departure of the plane at Holly Springs were borne out by the Holly Springs Police and the presence of the pickup truck containing fuel tanks, aircraft radio equipment, flight logs and folders bearing the identification number of the plane in question. The fact that an object was left behind near the airport runway after the aircraft departed from the Forrest City Airport was clearly corroborated when local police subsequently found a fifty pound bundle of marijuana there. The location of the fleeing suspects at the Arlington Airport in Tennessee was borne out by their capture. The search of the Piper Navajo aircraft, revealing the marijuana debris, supports the conclusion that this was the plane that the Customs officials had been tracking, and supports the verdicts against the three defendants.

Defendants cite *United States v. Kilgus*, 571 F.2d 508, 510 (9th Cir.1978), where the Ninth Circuit Court of Appeals held that the testimony of an officer relying on the FLIR system to make a unique identification of the defendant's aircraft as the same aircraft that landed on a lake bed was inadmissible because the FLIR is not a generally accepted technique for such a precise identification. The court added, however, the FLIR is a perfectly acceptable method for the generic identification of objects, and can be used readily to distinguish between plane and boat or even between a Lear jet and DC-3. *Id.* at 509. In the present case,

there was no attempt to make a specific identification of the suspect aircraft in question. The surveillance equipment was used simply to identify the plane as a low wing, twin engine aircraft. Eyewitness testimony was used for the identification of the occupants of the plane and its number.

The district court made the following finding in support of its decision to deny a continuance for inspection of Cessna Jet plane and its equipment:

> Defendants have raised at an early stage, and throughout the trial, objection that the Court did not require the government to permit the defendants, their counsel and experts to examine the plane and the equipment which was designated as secret by the Customs Service. The Court does not believe that this ruling effectively prevented the assistance of counsel in this case or limited a reasonable right of cross-examination under the Sixth Amendment.

\*　　\*　　\*　　\*　　\*　　\*

It is appropriate to note that information obtained from the U.S. Customs' "magical instruments" (as characterized by one of the defendants' counsel), was verified and corroborated from time to time as accurate and correct during the course of the tracking, chase and eventual seizure of the Piper Navaho and its suspected occupants. The essential characteristics of the plane, except for color and identification number, proved to be correctly shown; the landing and departure at Holly Springs were borne out by other objective and eyewitness evidence; the dropping of a bundle of marijuana was established by later visual contact, and the location of the apparently fleeing suspects at or near the Arlington airport was also corroborated. This is sufficient to overcome an unfounded defendant contention that the radar and infrared devices could really not perform as competent and qualified witnesses testified that they did.

We find no constitutional violation in the failure of the district court to dismiss the indictment and its denial of discovery of the aircraft and equipment.

## IV

Appellants also argue that the prosecutor violated their fifth amendment rights by improperly commenting on their election not to testify at trial. Two particular statements made by the prosecutor are objected to on appeal. First, the prosecutor made the following comment in discussing Brickey's presence at Holly Springs, Mississippi:

"Mr. Taylor ran from that . . . I mean, Mr. Brickey ran from that truck, hit a barbed wire fence. He ripped his coat, some of that coat on the barbed wire fence, left a trail of down leading from that fence, apprehended about three hours later in the same direction, about three miles from the Holly Springs airport wearing the exact same jacket, trailing the exact same down, soaking wet, no reason why he is there from Florida, no visible means of transportation, and there he is in Holly Springs, Mississippi."

Second, the prosecutor commented on the failure of defense counsels' proof as follows:

"Why do we bring all these folks in? And we listen to the defense attorneys and they talk about the fact that the proof is going to show there were two aircraft, and proof is going to show this is all a big mistake. Mr. Porter and Mr. Taylor should never have been arrested. We sit here and it is obvious that is not the case.

"Why, why do we sit here? We have been made these promises by the defense attorneys and we get ready for their proof and we are all on the edge of our seats and we are thinking, here it comes, government, here we are going to show you, and they call their witness and out comes an escaped prisoner that has been in jail off and on since 1969 to say that the Sheriff told him there was some tape in the truck, not that he unloaded it or not that the truck, as it has been implied, that that is it. This is the defense proof. A stipulation that the aircraft carried so many volts and lights were so many candle power. Why are we here?"

Although the District Judge expressed some concern about the comments of the prosecutor, he concluded that they presented no constitutional violation. He instructed the jury that no inference was to be drawn from the silence of defendants.

In *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), the Supreme Court recognized that a prosecutor may not comment on the failure of a defendant to testify. It is not error, however, for a prosecutor to comment on the failure of the defense to produce certain evidence. *United States v. Bright,* 630 F.2d 804 (5th Cir.1980). The standard in this Circuit under which comments of a prosecutor are to be judged was set forth in *United States v. Robinson,* 651 F.2d 1188, 1197 (6th Cir.), *cert. denied,* 454 U.S. 875, 102 S.Ct. 351, 70 L.Ed.2d 182 (1981), as follows:

To reverse a conviction for improper comment on the criminal defendant's Fifth Amendment right to remain silent, "we must find one of two things: that 'the prosecutor's' manifest intention was to comment upon the accused's failure to testify or that the remark was 'of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.'" *United States v. Rochan,* 563 F.2d 1246, 1249 (5th Cir.1977); *United States v. Wells,* 431 F.2d 434, 435 (6th Cir.1970), *cert. denied,* 400 U.S. 997, 91 S.Ct. 475, 27 L.Ed.2d 448 (1971).

Based on our examination of the record, we conclude that the prosecutor's comments in the present case did not meet the *Robinson* requirements for reversal under the fifth amendment.

## V

Appellants assert various fourth amendment arguments challenging the validity of the issuance and execution of the warrant to search the hangar at the West Helena airfield. We hold, however, that the defendants had no expectation of privacy in the hangar, and, therefore, had no fourth amendment interest at stake. *See Rawlings v. Kentucky,* 448 U.S. 98, 104, 100

S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980); *United States v. Barry,* 673 F.2d 912, 917 (6th Cir.1982). Appellants Matthews (alias Taylor) and Brickey clearly have no privacy interest in the hangar. The record reveals that they had no possessory interest therein, nor any right to expect items located there to be secure within the meaning of the fourth amendment.

Appellant Porter asserts that he had a privacy interest as a permissive user of the hangar, and because he placed a lock on the hangar entrance. The owner of the hangar testified, however, that while he allowed Porter to use the hangar occasionally, Porter was given no control over it. The record also reveals that Porter knew his property was not the only property being stored in the hangar. The hangar owner had several items of personal property stored there.

We also conclude that the appellants' *Aguilar* and *Spinelli* arguments are without merit. *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

### VI

The most significant of Brickey's contentions is his argument that he was arrested without probable cause, in violation of the fourth amendment. He also contends that the arrest violated Mississippi statutory law. Section 99–3–7 of the Mississippi Code Annotated provides:

> An officer or private person may arrest any person without warrant, for an indictable offense committed, or a breach of the peace threatened or attempted in his presence; or when a person has committed a felony, though not in his presence; or when a felony has been committed, and he has reasonable ground to suspect and believe the person proposed to be arrested to have committed it; or on a charge made upon reasonable cause, of the commission of a felony by the parties proposed to be arrested. And in all cases of arrest without warrant, the person making such arrest must inform the accused of the object and cause of the arrest, except when he is in the actual commission of the offense, or is arrested

on pursuit. Miss.Code Ann. § 99–3–7 (1972)

■ In the present case it is undisputed that the officer who arrested Brickey did not inform him of the object and cause of his arrest. We hold that the question whether Brickey's arrest was legal for purposes of this proceeding in federal court is controlled by federal standards. The central question is not whether there was a technical violation of a Mississippi statute, but whether there was probable cause for the arrest. *See Upshaw v. State,* 350 So.2d 1358, 1363 (Miss.1977) (holding that even though § 99–3–7 of the Mississippi Code was not complied with, because the arresting officer failed to inform the accused of the object and cause of his warrantless arrest, the arrest was still valid because the State met its burden of proving probable cause for the arrest).

■ As a general rule, a defendant can be arrested without a warrant only if probable cause to arrest exists at the time of the arrest. *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964); *United States v. Calandrella,* 605 F.2d 236, 246 (6th Cir.), *cert. denied, sub nom.,* 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979). The burden of showing probable cause to make a warrantless arrest is on the government. *United States v. Perez-Castro,* 606 F.2d 251, 253 (9th Cir.1979).

Whether the Government and local officials had probable cause to arrest Brickey depends on whether the down feathers and torn fabric on the airport fence were found before or after the arrest. Brickey claims they were not found until after his arrest, and that the only basis for his arrest was information received concerning a man "going down to the railroad wearing a blue coat" approximately three miles from Holly Springs Airport. Brickey's argument is based on the testimony of an agent of the Mississippi Bureau of Narcotics, who said that the Bureau made its investigation of the airport area, finding the goose down and torn cloth, hours after Brickey already had been arrested and taken into custody.

Further examination of the record indicates that the discovery of the incrimina-

ting items in question was made prior to Brickey's arrest. Although Mississippi Narcotics agents seem to have made a search of the airport after the arrest, the arrest was not made by them. The arrest was made by the local deputy sheriff, and the record indicates that he found the items in question during a search of the area made before the arrest. The deputy sheriff testified that he arrived at the Holly Springs Airport between 2:00 and 3:00 a.m. on the morning of January 27. He said that after daybreak he and another deputy looked around the area and found the torn portion of a blue coat and the down feathers. He then testified that it was "[l]ater that morning, after we left the airport" that he received the information concerning a man with a blue coat going down toward the railroad and proceeded to arrest Brickey.

■ In addition to the deputy's knowledge of the torn piece of blue fabric and the down feathers, the evidence leading to the arrest included the discovery of the pickup truck with the aircraft equipment inside, and the report that an unidentified man was walking toward a railroad track near the airport. Furthermore, Brickey was found on or beside the railroad tracks, which were only two or three miles from the airport and were in the same general direction as the trail of down feathers leading away from the airport. We conclude that this evidence, which was known prior to the arrest, establishes probable cause for Brickey's arrest. All of the evidence gained from the arrest was properly admitted.

■ Brickey also argues that the District Judge erred in denying his motion that the District Judge recuse himself for prejudice. The sole basis for this argument was a statement made by the District Judge during preliminary motions that the three defendants were "apparently caught red-handed." There is no claim that the District Judge had any prior dealings with the appellants, or that he had any preconceived prejudice against them. We hold that Brickey's claim is without merit. Impressions based on information gained in the proceedings are not grounds for disqualification in the absence of pervasive bias.

*Whitehurst v. Wright,* 592 F.2d 834, 838 (5th Cir.1979); *United States v. Patrick,* 542 F.2d 381 (7th Cir.1976), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977).

■ Likewise, we find no merit in Brickey's claim of error concerning the denial by the District Judge of his motion to sever the trials. The granting or denial of a severance is within the sound discretion of the trial court. *United States v. Goble,* 512 F.2d 458, 466 (6th Cir.), *cert. denied,* 423 U.S. 914, 96 S.Ct. 220, 46 L.Ed.2d 143 (1975). In the present case the District Judge determined that there were not so many defendants involved that the jury would be confused, or unable to determine the merits of the charges as to each defendant individually. After reviewing the record we hold that the District Judge clearly did not abuse his discretion in reaching this conclusion.

■ Finally, for the reasons expressed in this opinion, we hold that the District Judge did not err in denying Brickey's motion for a directed verdict of acquittal.

Attached hereto as an appendix are letters from the Assistant United States Attorney and the attorney for Matthews alias Taylor relating to the identity of appellant Matthews alias Taylor.

Affirmed.

## APPENDIX

[LETTERHEAD OF UNITED STATES ATTORNEY, WESTERN DISTRICT OF TENNESSEE]

[Dated 31 January 1983]

[Filed February 2, 1983]

Mr. John P. Hehman, Clerk
U.S. Court of Appeals
Sixth Circuit
U.S. Post Office & Courthouse Bldg.
Cincinnati, Ohio 45202

Re: United States of America
    v.
    James Blair Porter, Jr.,
    Kenneth Wayne Taylor, and
    Gary Dennis Brickey
    81–5618; 81–5617; and 81–5648

Dear Mr. Hehman:

A situation has arisen in the above-captioned cases which I feel should be brought to the attention of your office and the court.

On December 8, 1982, this case was presented for oral argument and argued in the United States Court of Appeals for the Sixth Circuit. As yet a decision has not been issued in the case.

Approximately one week ago the person who was known to us as Kenneth Wayne Taylor, one of the defendants in this case, became a fugitive, and a warrant was issued for his arrest. This warrant caused an investigation to be done concerning the whereabouts of Mr. Taylor; and at that time it was determined that Kenneth Wayne Taylor lived in the area of Fort Worth, Texas. Upon investigation by the Marshal Service, it became apparent that Kenneth Wayne Taylor of Fort Worth, Texas, who had an identical background to that given by the Kenneth Wayne Taylor in this case, was not the defendant who was arrested, tried, and appealed his conviction in the present case. Further investigation has revealed that the person whom this court knew as Kenneth Wayne Taylor is in fact an individual by the name of John Matthews, a previously convicted drug smuggler, whose whereabouts are unknown. Upon checking with the Probation Officer, who did the pre-sentence report, it has been determined that Mr. Matthews completely assumed the identity of Kenneth Wayne Taylor, and supplied background information, records, and other relevant material both to the trial court and to the Probation Officer who was conducting the pre-sentence report.

Because this is a somewhat bizarre situation, i.e., a person assuming another identity and being able to slip through the entire judicial and prosecutorial system before his true identity becomes known, I felt that this situation ought to be brought to the attention of the court. Thank you.

Very truly yours,

W. HICKMAN EWING, JR.
United States Attorney

By /s/ TIMOTHY R. DiSCENZA
    Timothy R. DiScenza
    Assistant United States Attorney

TRD/mjl

cc: Mr. Wayne Emmons
    Attorney for Kenneth Wayne Taylor
    Suite 932, 555 Griffin Square
    Dallas, Texas 75202

[LETTERHEAD OF WAYNE
EMMONS, LAWYER]

[Dated February 23, 1983]

[Filed February 28, 1983]

Mr. John P. Hehman, Clerk
United States Court of Appeals
Sixth Circuit
United States Post Office and
Courthouse Building
Cincinnati, Ohio 45202

RE: Case No. 81–5618, United States of
    America v.
    Kenneth Wayne Taylor.

Dear Mr. Hehman:

Thank you for your letter of February 2, 1983. I apologize for my delay in responding, but I was out of my office February 10–20 and did not see your letter until my return.

I was aware of the matters that have arisen since oral argument regarding the identity of my client, Mr. Kenneth Wayne Taylor. I appeared with Mr. DiScenza, the Assistant United States Attorney, before Judge Odell Horton sometime early in January at which time the government moved for a revocation of my client's appeal bond based on the allegation that he had not reported to the U.S. Marshal every Friday as required by Judge Wellford. At that time I tried to locate my client, but could not and the motion was granted and Mr. DiScenza reported to the Court at that time the suspicions of the government regarding my client's identity. That was all I knew of the matter until I received a copy of Mr. DiScenza's letter of January 31, 1983.

It perhaps goes without saying, but nevertheless I should say for the record that I have absolutely no knowledge of any fraud on the Court. My client, from my first contact with him, represented himself as Kenneth Wayne Taylor and has up until I last talked with him sometime prior to oral arguments.

As an officer of the Court I should also state that, other than stated above, I have nothing to controvert the allegations of the government, as "bizarre" as they are.

Having never faced this situation before nor knowing of anyone who has faced it, I assume my duty is to continue to represent my client, be he Kenneth Wayne Taylor, Matthews, or whomever, until appeals have been exhausted or relief granted. If the Court has any thoughts contra, I assume I shall hear.

Very truly yours,

/s/ WAYNE EMMONS

Wayne Emmons

WE: ps