**UNITED STATES of America,**
**Plaintiff,**

v.

**Arvin RIDLEY, Defendant.**

**No. CR–3–01–047(02).**

United States District Court,
S.D. Ohio,
Western Division.

Dec. 28, 2001.

Dick Chema, Dayton, OH, for plaintiff.

Kenneth L. Lawson, Cincinnati, OH, Derek Farmer, Columbus, OH, for defendants.

DECISION AND ENTRY OVERRULING DEFENDANT'S REQUEST FOR DISCLOSURE OF FAVORABLE EVIDENCE (DOC. # 24); DECISION AND ENTRY OVERRULING DEFENDANT'S MOTION FOR BILL OF PARTICULARS (DOC. # 25); DECISION AND ENTRY SUSTAINING DEFENDANT'S REQUEST FOR DISCOVERY (DOC. # 26); DECISION AND ENTRY OVERRULING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS (DOC. # 29); CONFERENCE CALL SET

RICE, Chief Judge.

In Count 1 of the Indictment (Doc. # 10), the Defendant Arvin Ridley ("Defendant") is charged with conspiring to possess with intent to distribute and to distribute in excess of five kilograms of cocaine, in violation of 21 U.S.C. § 846. In Count 2, he is charged with possessing with intent to distribute approximately 48 kilograms of cocaine, in violation of 21 U.S.C. § 841. This case is now before the Court on the following motions filed by the Defendant, to wit: Request for Disclosure of Favorable Evidence (Doc. # 24); Motion for Bill of Particulars (Doc. # 25); Request for Discovery (Doc. # 26); and Motion to Suppress Statements (Doc. # 29). Herein, the Court rules upon those motions in the above order.

*I. Defendant's Request for Disclosure of Favorable Evidence (Doc. # 24)*

■ With this motion, which is based upon *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Defendant requests that the Court order the Government to disclose all evidence it knows or becomes known to it, which is favorable to the Defendant and material to either his guilt or penalty.

Under *Brady*, the Government is obligated to disclose evidence to a criminal defendant which is both favorable to the defendant and material either to guilt or to punishment. *Kyles v. Whitley*, 514 U.S. 419, 432, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). That obligation extends to impeachment evidence, as well as to exculpatory evidence. *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). *See also, United States v. Mullins*, 22 F.3d 1365, 1372 (6th Cir.1994) ("Clearly, *Brady* recognizes no distinction between evidence which serves to impeach a Government witness' credibility and evidence which is directly exculpatory of the defendant."). *Brady* did not, however, create a constitutional right to discovery in a criminal prosecution. *See e.g., Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977) ("There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one...."); *United States v. Bencs*, 28 F.3d 555, 560 (6th Cir.1994) (same), *cert. denied*, 513 U.S. 1117, 115 S.Ct. 915, 130 L.Ed.2d 796 (1995). Indeed, the Sixth Circuit has held that the Government is typically the sole judge of whether evidence in its possession is subject to disclosure under *Brady*. *United States v. Driscoll*, 970 F.2d 1472, 1482 (6th Cir.1992), *cert. denied*, 506 U.S. 1083, 113 S.Ct. 1056, 122 L.Ed.2d 362 (1993); *Presser*, 844 F.2d at 1281. Given that *Brady* does not provide a right of discovery, this Court overrules Defendant's Request for Favorable Evidence (Doc. # 24). This ruling should not, however, be construed as relieving the Government of its obligations under *Brady*.

## II. Motion for Bill of Particulars (Doc. # 25)

With this motion, the Defendant requests a bill of particulars, requiring the Government to disclose the following information, to wit: 1) the names of all individuals who, according to the Government, participated in the charged offenses, including their addresses and telephone numbers; 2) the exact place or location where the charged offenses are alleged to have occurred; 3) the precise time of day or night when the charged offenses are believed to have occurred; 4) the precise manner in which the Defendant is alleged to have committed the charged offenses; 5) the identity of any witnesses who are alleged to have been present when the charged offenses occurred; and 6) the actions of the Defendant that are alleged to have constituted the charged offenses.

Under Rule 7 of the Federal Rules of Criminal Procedure, which governs the prosecution by an indictment or information in criminal cases, a court may direct the filing of a bill of particulars. *See* Rule 7(f). "The test in this Circuit for determining whether a bill of particulars should issue is whether the indictment is sufficiently specific to inform defendants of the charges against them, to protect them from double jeopardy, and to enable them to prepare for trial." *United States v. Hayes*, 1989 WL 105938, at *3, 884 F.2d 1393 (6th Cir.1989) (citing *United States v. Azad*, 809 F.2d 291, 296 (6th Cir.1986), *cert. denied*, 481 U.S. 1004, 107 S.Ct. 1626, 95 L.Ed.2d 200 (1987)). *Accord United States v. Salisbury*, 983 F.2d 1369, 1375 (6th Cir.1993) ("A bill of particulars is meant to be used as a tool to minimize surprise and assist [a] defendant in obtaining the information needed to prepare a defense and to preclude a second prosecution for the same crimes"); *United States v. Birmley*, 529 F.2d 103, 108 (6th Cir. 1976) ("The purposes of a bill of particulars are to inform the defendant of the nature of the charge against him with sufficient precision to enable him to prepare for trial, to avoid or minimize the danger of surprise at the time of trial, and to enable him to plead his acquittal or convic-

tion in bar of another prosecution for the same offense, when the indictment itself is too vague and indefinite for such purposes"). However, a bill of particulars is not intended to allow the defense "to obtain detailed disclosure of all evidence held by the government before trial." *Salisbury*, 983 F.2d at 1375. *See also, United States v. Cooper*, 1990 WL 67885, 902 F.2d 1570 (6th Cir.1990) ("A bill of particulars is not a discovery device and should not be used 'to obtain detailed disclosure of the government's evidence prior to trial.' *United States v. Kilrain*, 566 F.2d 979, 985 (5th Cir.), *cert. denied*, 439 U.S. 819, 99 S.Ct. 80, 58 L.Ed.2d 109 (1978).""). "This is particularly true in a conspiracy case in which the Government is not required to disclose all overt acts alleged to have occurred in furtherance of the conspiracy." *Hayes*, 1989 WL 105938, at *3, 884 F.2d 1393; *accord United States v. Martin*, 1987 WL 38036, at *3, 822 F.2d 1089 (6th Cir.1987) (need for a bill of particulars is particularly obviated "in a conspiracy case where the Government is not required to disclose all overt acts alleged to have occurred in furtherance of the conspiracy").

The Court overrules the Defendant's Motion for Bill of Particulars (Doc. # 25). It is apparent from the briefing of his Motion to Suppress Statements (Doc. # 29) that the Defendant is aware of the facts and circumstances leading to this prosecution. Therefore, a bill of particulars is not necessary in order to avoid surprise at trial or to permit the Defendant to prepare for trial. In addition, the Indictment is sufficiently detailed to prevent the Defendant from being prosecuted a second time for the offenses with which he is charged in this prosecution. Finally, examining the type of the information the Defendant is seeking with this motion demonstrates that he is using his request for a bill of particulars in order to obtain a detailed description of the Government's proof against him. A bill of particulars is not to be used as such a discovery tool. *See Hayes, supra* (affirming the decision of the District Court to deny defendant's request for a bill of particulars, because he was using it as a general discovery request).

Accordingly, the Court overrules the Defendant's Motion for a Bill of Particulars (Doc. # 25).

### III. Request for Discovery (Doc. # 26)

With this motion, the Defendant requests that the Government be ordered to disclose all information he is entitled to receive under Rule 16 of the Federal Rules of Criminal Procedure. The Government has not responded to this motion. Rule 16(a)(1) provides that a criminal defendant is entitled to discover certain categories of information. The Court sustains the Defendant's motion and orders the Government to provide the materials to which the Defendant is entitled under Rule 16(a)(1), to the extent same have not already been provided, within seven (7) days from date.

### IV. Motion to Suppress Statements (Doc. # 29)

With this motion, the Defendant requests that the Court suppress statements which he gave to federal law enforcement officials on April 11, 2001. On July 6, 2001, the Court conducted an oral and evidentiary hearing on this motion. In accordance with the briefing schedule established by the Court, the parties have submitted their post-hearing memoranda. *See* Docs. # 53 and # 55. The Court now rules upon that motion. The Court begins by setting forth its findings of fact, based upon the evidence presented during the hearing on Defendant's motion.

The genesis of this prosecution and the Defendant's Motion to Suppress Statements was the theft, in early April, 2001, of 48 kilograms of cocaine. On Monday,

April 9, 2001, Special Agent Robert Brawner ("Brawner") of the Federal Bureau of Investigation ("FBI") met the Defendant and his cousin in the parking lot of the University of Dayton Arena.[1] Prior to that meeting, Defendant's cousin had told Brawner that the Defendant was in the possession of a large quantity of cocaine, in the range of 20 kilograms.[2] During their meeting on April 9th,[3] Defendant told Brawner that Sentel Alexander Smith ("Smith") had been involved in the theft of 20 kilograms of cocaine from a residence in Trotwood, Ohio. According to the Defendant, he was merely holding the cocaine for the individual who had stolen it. He also told Brawner that he was willing to deliver the 20 kilograms of cocaine to Government agents, but that he did not want to be involved. Approximately one and one-half hours after that meeting had terminated, Defendant's cousin delivered 20 kilograms of cocaine to Brawner at the University of Dayton Arena. During their first meeting, the Defendant lied to Brawner about his involvement in the theft of the cocaine and the amount of cocaine which had been stolen.

Brawner continued his investigation of the matter and, over the next few days, discovered information that cast doubt upon the story the Defendant had told Brawner on April 9th. For instance, on April 11, 2000, Smith told Brawner and Agent Thomas Buchenroth ("Buchenroth") of the Internal Revenue Service that he (Smith) and the Defendant had been involved in the theft of two pieces of luggage from a residence in Trotwood. According to Smith, he and the Defendant discovered 48 kilograms of cocaine inside the two pieces of luggage. Smith also told the officers that the Defendant had set up the theft of the luggage, and had recruited him to participate in the theft. In addition, Smith informed Brawner and Buchenroth that the cocaine was being stored at the residence of Bobby Eugene Johnson ("Johnson"), an individual who worked as a cook for Defendant at an after-hours establishment.[4] Thus, Smith had given the officers information which cast doubt on Defendant's statements that only 20 kilograms of cocaine had been stolen and that he had not been involved in that theft.

As a consequence, Brawner decided to speak with the Defendant again. In the early evening hours of April 11th, Brawner telephoned Defendant, leaving a message that there was a problem regarding the cocaine and asking Defendant to return the telephone call. Shortly thereafter, Defendant returned Brawner's telephone call. Brawner told the Defendant that he wanted to meet and to talk, and the two agreed to meet in the parking lot of the Crystal Water Company, a business establishment located on South Patterson Boulevard in Dayton. At about 8:15 p.m., on April 11th, Brawner met the Defendant at that parking lot. Brawner arrived in an automobile with FBI Agent Steven Morris ("Morris"). FBI Agent Don Riedman ("Riedman") and Detective Kevin Bollinger ("Bollinger") of the Dayton Police Department observed the meeting from a separate automobile. The Defendant arrived alone in the same vehicle he had driven to his meeting with Brawner two days earlier.

Brawner and Morris got out of their vehicle, while the Defendant exited his.

1. The Defendant has not requested that the Court suppress his April 9th statements to Brawner.

2. The Defendant's cousin was a long-time informant employed by Brawner.

3. Brawner was accompanied on April 9th by FBI Agent Don Riedman.

4. Smith also helped the officers recover four kilograms of cocaine which were being stored at Smith's cousin's residence.

Brawner then informed the Defendant that there were inconsistencies in the version of events he had recounted during their earlier meeting. Brawner also asked Defendant whether he possessed any weapons or drugs. The Defendant indicated that he did not and gave Brawner consent to search his vehicle. Brawner searched the vehicle, discovering neither contraband nor weapons. The two continued to converse for a few moments, following which Brawner asked the Defendant whether he would be willing to go to the FBI office located in the Federal Building in downtown Dayton, in order that they could have a more private meeting. The Defendant agreed, accompanying Brawner in his vehicle.[5]

When they arrived, Brawner parked that vehicle at the rear of the Federal Building and entered that building from the rear. When they entered the offices of the FBI, the Defendant and Brawner went to a conference room, where they were joined by Buchenroth. In that room, Brawner began to question the Defendant, who, in essence, confessed his involvement in the theft of 48 kilograms of cocaine. During this process, Brawner left the room for a while.[6] During his absence, Brawner was told that Johnson had given agents an additional 16 kilograms of cocaine and had related a version of events to them which confirmed what Smith had told Brawner. When Brawner returned to the conference room, he read Defendant the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Defendant indi-

cated that he understood his rights and signed a form indicating that he was willing to waive those rights, and to continue to speak with Brawner and Buchenroth, both of which he did.[7]

In his Post–Hearing Memorandum (Doc. # 53), the Defendant argues that the Court should suppress the statements he gave to Brawner and Buchenroth, before he was given his *Miranda* warnings, because those statements occurred in the context of a custodial interrogation. In addition, the Defendant contends that his statements, made after he had been given those warnings, must be suppressed, because they were involuntary. The Defendant also argues that his statements must be suppressed, because he had been arrested before making those statements and the officers lacked probable cause to seize him. As a means of analysis, the Court will discuss the Defendant's three arguments in the above order.

### A. Pre–Miranda Statements

▄▄▄ The Defendant argues that the Court should suppress his statements on April 11th, which he made prior to the time that Brawner read the *Miranda* warnings to him. Under *Miranda*, the prosecution cannot use the statements of a defendant who has been subjected to a custodial interrogation, unless that questioning has been preceded by certain warnings. In *Miranda*, the Supreme Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into

---

5. The Defendant's vehicle was driven to and parked behind the Federal Building. Brawner testified that this was done in order to prevent Defendant's vehicle from being seen parked outside the building in which the office of the FBI was located.

6. When Brawner left, Buchenroth remained and continued to question the Defendant.

Buchenroth was joined by Bollinger who merely took notes of the conversation.

7. Those two law enforcement officials witnessed the form. It was signed at 9:22 p.m., a little over an hour after Brawner had met the Defendant at the parking lot of the Crystal Water Company.

custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. 1602. *See also, Stansbury v. California,* 511 U.S. 318, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994); *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). Herein, Brawner and Buchenroth questioned Defendant; therefore, the parties focus their arguments on the question of whether the Defendant was in custody when that questioning occurred. In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (quoting *Mathiason, supra,* 429 U.S. at 495, 97 S.Ct. 711). *Stansbury,* 511 U.S. at 322, 114 S.Ct. 1526. As the United States Supreme Court has instructed, "the only relevant inquiry is how a reasonable man in the suspect's shoes would have understood his situation." *Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). *Accord, United States v. Crossley,* 224 F.3d 847, 861 (6th Cir.2000).

In *United States v. Mahan,* 190 F.3d 416 (6th Cir.1999), the Sixth Circuit restated familiar principles that must be applied to ascertain whether an individual was in custody when interrogated:

> For an individual to be "in custody," there must be "a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *Thompson [v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995) ] (citation and internal quotation omitted). In determining whether a suspect is "in custody" for purposes of applying the *Miranda* doctrine, "the only relevant inquiry is how a reasonable man in the suspect's position would have under-

stood his situation." *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). *See also Thompson,* 516 U.S. at 112, 116 S.Ct. 457 (stating that the custody determination hinges upon whether, "given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave").

*Id.* at 421. In *United States v. Salvo,* 133 F.3d 943, 948 (6th Cir.), *cert. denied,* 523 U.S. 1122, 118 S.Ct. 1805, 140 L.Ed.2d 943 (1998), the Sixth Circuit explained:

The Supreme Court has distinguished between "custodial interrogation" and the mere questioning of a suspect in a "coercive environment":

> [A] noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question.

[*Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) ]. *See also, United States v. Phillip,* 948 F.2d 241, 247 (6th Cir.1991), *cert. denied,* 504 U.S. 930, 112 S.Ct. 1994, 118 L.Ed.2d 590 (1992) ("Coercive environments not rising to the level of formal arrest ... do not constitute custody within the meaning of *Miranda.*"); *United States v. Knox,* 839 F.2d 285, 291–292 (6th Cir.1988), *cert. denied,* 490

U.S. 1019, 109 S.Ct. 1742, 104 L.Ed.2d 179 (1989).

*Id.* at 948.

During the suppression hearing, the Defendant testified that, as soon as he arrived at the parking lot of the Crystal Water Company, he observed an officer standing outside a Chevrolet Suburban holding a "long rifle with a big clip in it." Transcript of July 6, 2001 Hearing (Doc. # 46) at 151. Defendant also testified that shortly thereafter, Brawner indicated that there were inconsistencies in the story Defendant had told him two days earlier and that the agents were going to take him "downtown," so that they could get it right. *Id.* at 152. At that point, the Defendant asked Brawner whether he would be going to jail, and the agent said that the Defendant was definitely going to "do some time," perhaps two to three years. *Id.* According to Defendant's testimony, Brawner then asked another agent to handcuff the Defendant, with his hands behind his back. *Id.* The Defendant testified that he was then transported to the FBI office. *Id.* at 153. If the Defendant's testimony is believed, he was taken into custody at the parking lot of the Crystal Water Company, and his statements prior to the time he was given the *Miranda* warnings must be suppressed. However, Brawner's testimony regarding events surrounding his meeting with the Defendant at the parking lot differs dramatically. According to Brawner's testimony, the Defendant voluntarily agreed to accompany him to the office of the FBI in the Federal Building and that he was not placed in handcuffs. Based upon the reasons which follow, the Court concludes that the Defendant's testimony was not credible, while Brawner's was. In addition, the Court concludes that under Brawner's version of events, the Defendant was not in custody prior to the time that he was given his *Miranda* warnings.

During his cross-examination, the Defendant conceded that he had lied to Brawner, during their April 9th meeting, about his involvement in the theft of the cocaine and the amount of cocaine which had been stolen. Doc. # 46 at 160. Consequently, it cannot be questioned that the Defendant is willing to tell untruths. However, the Court does not base its finding that the Defendant's testimony lacked credibility, *solely* upon the fact that he had lied to Brawner on an earlier occasion. In addition, Defendant's testimony during the suppression hearing was simply not believable. For instance, the Defendant testified that when he arrived at the Crystal Water Company parking lot, he observed an officer standing outside a vehicle holding a rifle with a large clip of ammunition in it. This Court cannot believe that a law enforcement officer would stand in the parking lot of a business establishment, near to downtown, holding a rifle with a large clip therein. Moreover, although the Defendant admitted that he had lied to Brawner about the amount of cocaine that had been stolen, 48 kilograms, and his involvement in that theft, he attempted to place blame on his cousin (Brawner's informant) for the fact that only 20 kilograms were turned over to the authorities on April 9th. In addition, the Defendant testified that at the parking lot of the Crystal Water Company, he asked Brawner whether he was going to jail and the agent told him yes, perhaps for two to three years. However, at other times during his testimony, the Defendant complained about the failure of Brawner and Buchenroth to tell him how much time he would have to spend in jail. That inconsistency causes the Court to doubt the credibility of the Defendant's testimony.

Rather than crediting the testimony of the Defendant, the Court believes that given by Brawner. Accepting Brawner's version of events, the Court concludes that

the Defendant was not in custody when he was questioned at the office of the FBI, before having been read his *Miranda* rights. When he met the Defendant at the parking lot of the Crystal Water Company, Brawner asked the Defendant whether he would accompany the agents to that office, in order that the inconsistency between his April 9th statement and other information learned during the investigation could be discussed. In response, the Defendant voluntarily agreed to accompany Brawner to the office for that purpose. The Defendant was not told he was under arrest, nor was he restrained in any manner (by handcuffs or otherwise). Brawner testified that the Defendant could have left at any time. The only conceivable reason for concluding that the Defendant was in custody is that the interview occurred in the offices of the FBI. That fact alone is not sufficient to cause this Court to conclude that the Defendant was in custody at the offices of the FBI. *See e.g.,Beheler,* 463 U.S. at 1125, 103 S.Ct. 3517 (fact that interrogation occurs at police station does not, in itself, require

*Miranda* warnings); *Mathiason,* 429 U.S. at 495–96, 97 S.Ct. 711 (same). Although being questioned in an FBI office may constitute a coercive environment, such an environment, in and of itself, does not result in a custodial interrogation.

■ Accordingly, the Court concludes that the Defendant was not in custody when he was questioned by Brawner and Buchenroth, before he was given his *Miranda* warnings. Therefore, the failure to administer those warnings does not serve as the basis for suppressing Defendant's pre-*Miranda* statements.[8]

### B. Post–Miranda Statements

■ Additionally, the Defendant argues that the Court should suppress the statements he made to Brawner and Buchenroth, after being given the *Miranda* warnings, because those statements were involuntary. This Court cannot agree. While reaffirming *Miranda,* the Supreme Court, in *Dickerson v. United States,* 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405

---

**8.** During the suppression hearing, Brawner testified that, shortly after he and the Defendant got to office of the FBI, the Defendant asked Brawner whether he needed a lawyer. Brawner responded that he could not advise the Defendant on that subject. To the extent that Defendant believes that his question to Brawner mandates the suppression of his statements, in accordance with the rule announced in *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), this Court cannot agree. As an initial matter, the rule established in *Edwards* is applicable only if a person is subjected to an interrogation while in custody. *See Burket v. Angelone,* 208 F.3d 172, 197 (4th Cir.), *cert. denied,* 530 U.S. 1283, 120 S.Ct. 2761, 147 L.Ed.2d 1022 (2000); *United States v. Wyatt,* 179 F.3d 532, 538 (7th Cir.1999); *United States v. Bautista,* 145 F.3d 1140, 1147 (10th Cir.), *cert. denied,* 525 U.S. 911, 119 S.Ct. 255, 142 L.Ed.2d 210 (1998). Since this Court has concluded that the Defendant was not in custody when the questioning occurred, there was no violation of the rule established in *Edwards.* Moreover,

even if the Defendant had been in custody, his question to Brawner would not be sufficient to invoke his right to counsel. In *United States v. Suarez,* 263 F.3d 468 (6th Cir.2001), the Sixth Circuit reiterated that, in accordance with *Edwards,* the custodial interrogation of a person must stop, if he asks for the assistance of counsel. *Id.* at 482, 101 S.Ct. 1880. Therein, the Sixth Circuit also noted that the request for the assistance of counsel must be unambiguous and unequivocal. *Id.* (citing *Davis v. United States,* 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994)). Herein, if it were necessary to decide, this Court would conclude that the Defendant's question to Brawner was not an unambiguous and unequivocal request for counsel. *See Diaz v. Senkowski,* 76 F.3d 61, 65 (2nd Cir. 1996) ("Do you think I need a lawyer?" not an unambiguous request for counsel); *United States v. Ogbuehi,* 18 F.3d 807, 813 (9th Cir. 1994) (defendant's questions during his interrogation, "Do I need a lawyer?" or "Do you think I need a lawyer?" not unequivocal request for counsel).

(2000), noted that "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of *Miranda* are rare." *Id.* at 444, 86 S.Ct. 1602 (internal quotation marks and citation omitted). This is not one of those rare cases. In *United States v. Gatewood*, 230 F.3d 186 (6th Cir.2000) (*en banc*), the Sixth Circuit noted that " 'coercive police activity is a necessary predicate to finding that a confession is not voluntary.' " *Id.* at 192 (quoting *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986)). Herein, there is no evidence that the agents employed coercive tactics on the Defendant in order to compel him to discuss his involvement in the theft of the 48 kilograms of cocaine. For instance, there is no evidence that the Defendant was subjected to any form of physical or psychological abuse, while he was interrogated by Brawner and Buchenroth. The Defendant was given the *Miranda* warnings, indicated that he understood them and that he was willing to continue to talk to the officers.

### C. Lack of Probable Cause

 The Defendant also argues that his statements must be suppressed, because he had been arrested or seized, without probable cause, before he made those statements. The Court agrees with the implicit legal premise that the statements of a person who has been arrested or seized without probable cause must be suppressed, even if he was given *Miranda* warnings before being interrogated. However, based upon the evidence presented during the evidentiary hearing, the Court concludes that the Defendant was not seized before being interrogated and that, even if he was arrested, that seizure was supported by probable cause. Accordingly, the Court rejects the Defendant's argument in this regard.

The Sixth Circuit recently reiterated that "a 'seizure' occurs for purposes of the Fourth Amendment when the police detain an individual under circumstances where a reasonable person would feel that he or she is not at liberty to leave." *United States v. Butler*, 223 F.3d 368, 374 (6th Cir.2000), citing *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). *See also, United States v. Obasa*, 15 F.3d 603, 606 (6th Cir.1994). Herein, the Court finds that the Defendant was not seized when he was transported to the offices of the FBI. Rather, he voluntarily agreed to accompany Brawner to that facility, in order that the two could have a private discussion. Moreover, Brawner testified that the Defendant was free to leave during the interview.

 Even if the Defendant had been arrested or seized, when he was transported to those offices, the Court would conclude that the seizure was supported by probable cause. Although the officers did not have a warrant to arrest the Defendant, it is well-settled that the warrantless arrest of an individual does not violate the Fourth Amendment, as long as officers have probable cause to believe that the individual is committing or has committed an offense. *Beck v. Ohio*, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); *United States v. Dotson*, 49 F.3d 227 (6th Cir.), *cert. denied*, 516 U.S. 848, 116 S.Ct. 141, 133 L.Ed.2d 87 (1995). In *Dotson*, the Sixth Circuit explained the test to be applied to determine whether a warrantless arrest was lawful:

The Supreme Court has held that the test for whether an arrest is constitutionally valid is "whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of

which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); *see United States v. Thomas,* 11 F.3d 620, 627 (6th Cir.1993), *cert. denied,* 511 U.S. 1043, 114 S.Ct. 1570, 128 L.Ed.2d 214 (1994).

*Id.* at 230. The Sixth Circuit has further explained that probable cause is "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Padro,* 52 F.3d 120, 122–23 (6th Cir.1995). Moreover, " 'probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.' " *United States v. Wright,* 16 F.3d 1429, 1438 (6th Cir.) (quoting *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)), *cert denied,* 512 U.S. 1243, 114 S.Ct. 2759, 129 L.Ed.2d 874 (1994). In addition, an officer who has probable cause to believe that a person has committed some crime need not know precisely what crime he has committed. *United States v. Anderson,* 923 F.2d 450, 457 (6th Cir.), *cert. denied,* 499 U.S. 980, 111 S.Ct. 1633, 113 L.Ed.2d 729 (1991). Of course, the Government has the burden of proving that probable cause existed. *United States v. Porter,* 701 F.2d 1158 (6th Cir.), *cert. denied,* 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983).

Herein, on April 9th, the Defendant had told Brawner that Smith was involved in the theft of 20 kilograms of cocaine and indicated that he was merely holding the cocaine for Smith. Using his cousin as an intermediary, the Defendant furnished 20 kilograms of cocaine to that officer. However, two days later, Smith told Brawner that he had participated with the Defendant in the theft of 48 kilograms of cocaine from a residence in Trotwood. Smith also told Brawner that another individual was storing the cocaine for the Defendant. The fact that the Defendant had been able to furnish 20 kilograms of cocaine to Brawner, coupled with Smith's statements, causes this Court to conclude that reasonable grounds to believe Defendant had committed or was committing an offense relating to trafficking in cocaine were present and, therefore, that probable cause to arrest him existed at the time he agreed to accompany Brawner to the offices of the FBI.

Accordingly, the Court overrules the Defendant's Motion to Suppress Statements (Doc. # 29).

Counsel listed below will note that the Court has scheduled a telephone conference call on Thursday, January 3, 2002, at 8:20 a.m., for the purpose of selecting a new trial date and other dates for this prosecution.